**UNITED STATES of America by Ramsey CLARK, Attorney General**

v.

**LOCAL 189, UNITED PAPERMAKERS AND PAPERWORKERS, AFL–CIO, CLC; United Papermakers and Paperworkers, AFL–CIO, CLC: and Crown-Zellerbach Corporation.**

Civ. A. No. 68-205.

United States District Court
E. D. Louisiana,
New Orleans Division.

June 26, 1969.

Ramsey Clark, U. S. Atty. Gen., David
L. Rose, Robert T. Moore, Kenneth L.

Johnson and Dennis F. Gordon, Dept. of Justice, Washington, D. C., Louis C. La-Cour, U. S. Atty., New Orleans, La., for the United States.

Richard B. Sobol, New Orleans, La., George Cooper, New York City, Rita Murphy, Newark, N. J., Collins, Douglas & Elie, New Orleans, La., for plaintiffs-intervenors.

Warren Woods, McInnis, Wilson, Munson & Woods, Washington, D. C., C. Paul Barker, Dodd, Hirsch, Barker & Meunier, New Orleans, La., for defendant unions.

Louis F. Oberdorfer, John Vardaman, Jr., Wilmer, Cutler & Pickering, Washington, D. C., Michael J. Molony, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Crown-Zellerbach Corp.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

HEEBE, District Judge.

The United States instituted this action on January 30, 1968. The complaint sought, *inter alia,* to enjoin the defendants from violating the provisions of Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e et seq.), and from interfering with or violating the implementation of Executive Order 11246 forbidding racial discrimination in employment opportunities by government contractors.

On March 26, 1968, 282 F.Supp. 39, this Court decided the two following issues submitted to it by joint stipulation of all parties pursuant to Rule 42(b) of the Federal Rules of Civil Procedure:

A.  Whether, under the facts and circumstances of this case, the job seniority system which was in effect at the Bogalusa paper mill prior to February 1, 1968, was unlawful?

B.  If the answer to the above question is in the affirmative, what is the necessary or appropriate standard or guidelines for identifying the seniority of employees for purposes of promotion or demotion?

The Court ruled that the job seniority system was discriminatory and unlawful and then ordered the defendants to abolish forthwith the job seniority system and to establish a system of "mill seniority" in those cases where one or more of the competing employees is a Negro employee hired prior to a certain date.

The remaining issues in this case were reserved for trial beginning April 30, 1968. All counsel by stipulation agreed that the following was a complete list of the issues to be submitted to the Court for its determination at this second hearing:

a)  What is the affected class or classes of employees, if any, who may have suffered from discrimination on the grounds of race in assignments, transfers, promotions or demotions?

b)  Whether the requirement that an employee in the affected class hold a job on a permanent basis for a specified period of time after he is qualified before he is eligible for promotion to a permanent opening higher in his line of progression is lawful; and if so, for what period for each job?

c)  Whether a member of the affected class or classes is entitled by law to promotion, on the basis of the applicable seniority standard for permanent vacancies, more than one job slot in the line of progression above his present job, if the intermediate job or jobs do not afford any training necessary for proper performance in the higher job slot either because the training in the intermediate job or jobs is unrelated to any job higher in the line of progression, or because the training in the intermediate job or jobs would not add significantly to the skills already acquired; and if so, how the class of intermediate jobs which do not af-

ford any training necessary for proper performance in the higher job slots is to be identified?

d) Whether an employee in the affected class or classes is entitled by law to enter certain lines of progression at a point above the established entry point?

e) Whether an employee in the affected class is entitled by law to bid for a permanent job opening in a job slot more than one slot above his present job where, through temporary assignment to the intermediate job, he has complied with the applicable residence requirement for that job?

f) Whether assignments from the Extra Board were unlawfully made on the basis of race subsequent to the merger of the Extra Boards in May 1964; and if so, what relief is appropriate?

g) Whether Negro employees who, on the basis of race, were assigned to jobs not in lines of progression, or to jobs in short lines of progression with relatively low paying rates, are entitled as a matter of law to relief; and if so, what relief is appropriate?

h) Whether the law requires the merger of Local 189 and Local 189A; and if so, what terms are appropriate?

i) Whether the three senior Negro employees in the job slot of Wood Unloader-Chain. (Lorrain Crane) in the Wood Room were unlawfully induced to sign waivers which had the effect of making them junior to 11 white employees in the space of three weeks; and if so, what relief is appropriate?

j) Whether employees in the Utilities Department were unlawfully subjected to different requirements based upon their race, to qualify for the job of Boiler Room Helper; and if so, what relief is appropriate?

k) Whether the trainee program, in effect at the Crown paper mill from 1959 to December 1965, operated to discriminate unlawfully against Negro employees; and what relief is appropriate?

In accordance with the stipulation by all the parties hereto, trial was held in this Court commencing April 30, 1968, on all of the remaining issues as described immediately above. The Court now considering the three sets of Stipulation of Facts filed herein, the evidence elicited at the trial, and the briefs and memoranda filed by all counsel, and the entire record herein, now makes and files its:

## FINDINGS OF FACTS

### 1.

This suit was instituted by plaintiff, United States of America, seeking relief for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and for interference with the implementation of Executive Order 11246 forbidding racial discrimination in employment opportunities by government contractors. (Stipulation of facts, March 19, 1968).

### 2.

Defendant, Crown Zellerbach Corporation, is a corporation organized under the laws of the State of Nevada, with principal offices in San Francisco, California. Crown is engaged in the manufacture of lumber and paper products. A division of Crown maintains and operates a pulp and paper mill in Bogalusa, Louisiana. (Stipulation of facts, March 19, 1968).

### 3.

Defendant Crown is an employer engaged in an industry affecting commerce within the meaning of Sec. 701(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b). (Stipulation of facts, March 19, 1968).

4.

Since at least 1961, Crown has supplied materials under government contracts and subcontracts which contain equal employment opportunity clauses similar to, or the same as, those appearing in the Executive Order 11246 and Executive Order 10925, to the extent required by those orders. (Stipulation of facts, March 19, 1968).

5.

Defendant International United Papermakers and Paperworkers, AFL-CIO, CLC (hereinafter "the International" or "UPP") is the certified collective bargaining representative of the employees at Crown's Bogalusa Mill, with the exception of approximately 40 white employees who are represented by a local affiliate of the International Brotherhood of Electrical Workers; UPP's principal office is in Albany, New York. It maintains an office in Monroe, Louisiana. (Stipulation of facts dated March 19, 1968).

6.

UPP maintains two local unions for its members at the Bogalusa Mill. All white members belong to the defendant Local 189 of UPP (hereinafter "Local 189"). All Negro members belong to plaintiff-intervenor Local 189A of UPP (hereinafter "Local 189A"). (Stipulation of facts dated March 19, 1968).

7.

UPP, Local 189 and Local 189A are labor organizations engaged in an industry affecting commerce, within the meaning of Sec. 701(d) (e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (d) (e). (Stipulation of facts dated March 19, 1968).

8.

Plaintiff-intervenor David Johnson, Sr., is a Negro employee at the mill in Bogalusa. He is also President of Local 189A and has been employed at Crown's mill in Bogalusa since 1952. At the time of the trial, he was a Boiler Room utility man in the Utilities Department.

9.

Plaintiff-intervenor Anthony Hill is a Negro employee at Crown's Bogalusa Mill where he has been employed since 1952. At the time of the trial Hill was a utility man in the Recovery Room. He is also a member of Local 189A.

10.

Prior to May 17, 1964, certain jobs in the mill were restricted to white employees or members of Local 189. The remaining jobs were restricted to Negro employees or members of Local 189A. (Stipulation of facts, March 19, 1968).

11.

The jobs restricted to white employees were generally the higher paying jobs in the mill, while the jobs restricted to Negro employees were generally lower paying and less desirable jobs. (Stipulation of facts, March 19, 1968).

12.

Prior to May 17, 1964, two separate labor Boards (hereinafter "Extra Boards") were maintained to which newly hired employees were assigned. One of the Extra Boards was restricted to white employees; the other to Negro employees. White applicants for employment were hired on the basis of vacancies on the white Extra Board (i. e., the Extra Board within the jurisdiction of Local 189) and were assigned to that Board. Negro applicants for employment were hired on the basis of vacancies on the Negro Extra Board (i. e., the Extra Board within the jurisdiction of Local 189A) and were assigned to that Board. (Stipulation of facts, March 19, 1968).

13.

Employees on the Extra Board were used to fill temporary and permanent vacancies in the various lines of progression. The members of the Negro Extra

Board were eligible only for vacancies in the lines of progression open to Negroes. The members of the white Extra Board were eligible for vacancies within the progression lines open to whites.

### 14.

On May 17, 1964, the two Extra Boards were merged, and under the terms of the governing agreement between Crown and UPP, each employee on the merged Extra Board was eligible for temporary and permanent vacancies throughout the mill on the same basis as each other Extra Board member. (Stipulation of facts, March 19, 1968).

### 15.

Notwithstanding this merger of the two Extra Boards on May 17, 1964, the evidence shows that prior to February 14, 1968, the white employees on the merged Extra Board continued to work primarily in jobs formerly restricted to whites and the Negro employees on the merged Extra Board continued to work primarily in jobs formerly restricted to Negroes, or the less desirable jobs. (Stipulation of facts, May 30, 1968).

### 15a.

Further, under this merger, prior to February 14, 1968, Extra Board employees continued to be assigned to jobs with no choices of available Extra Board assignments being offered. If the employee refused the assignment, he was placed at the bottom of the line and would either receive the least desirable job or no work at all.

### 15b.

One result of the continuation of racially discriminatory Extra Board assignment methods from May 1964 until February 14, 1968, was to discourage Negroes from bidding into jobs other than traditional Negro jobs. Persons are more likely to bid for jobs in which they have had some experience and familiarity.

### 15c.

The assignment policies of the Extra Board tended to perpetuate the assignments of Negroes to traditionally Negro jobs and whites to traditionally white jobs.

### 16.

On January 16, 1966, Crown and UPP merged certain job progression lines formerly restricted to Negroes with other functionally related progression lines formerly restricted to whites. (Stipulation of facts, March 19, 1968).

### 17.

The basis of this merger of progression lines was the existing pay rates for each job. Therefore, in most cases the effect was to place all the formerly Negro jobs beneath the entry level job in the former white line of progression because the Negroes historically had only been permitted to occupy the least desirable jobs and the lower paying jobs.

### 18.

Under the recall system in effect prior to February 1, 1968, when there was a reduction in force in a progression line and certain employees were demoted out of the bottom job in the progression line, they normally returned to the Extra Board. Each such employee so demoted, however, would retain a "recall right" to the first opening in the bottom job in the progression line from which he was demoted. (Stipulation of facts, March 19, 1968).

### 19.

After the merger of the Negro and white progression lines on January 16, 1968, each employee maintaining recall rights to the entry job in a progression line that was formerly restricted to white workers retained a recall right to that job even though after the merger that job was no longer the entry point in the merged line, and some of the Negro workers in the lower jobs in the line were senior in terms of mill senior-

ity. (Stipulation of facts, March 19, 1968).

### 19a.

From about 1959 to December 1965, Crown had in effect at Bogalusa "a trainee" program. Under this program, employees would be trained for entry level jobs in selected lines of progression. While the program was in effect, Crown trained at least 107 employees, of whom 11 were Negro and 96 were white. Once trained for a particular entry job, the employee (trainee) acquired the first, or trainee, right to that job when it became vacant on a temporary or permanent basis. All of the 96 white trainees were trained for jobs in the white progression lines, while 8 of the 11 Negro trainees were trained for jobs in Negro progression lines.

After the merger of progression lines on January 16, 1966, defendants treated employees having "trainee" rights to a job in a white progression line as retaining that right to that job, even though after the merger that job was no longer the entry job in the reconstituted progression line and Negro employees in jobs below that job in the new line were senior to the trainee in length of service in the mill.

Both the system of "recall rights" as it existed prior to February 1, 1968, and the extension of those rights to the substantial number of people, almost all white, who were classified as "trainees," operated to hinder the progress of Negroes into jobs which, prior to the merger of the lines of progression on January 16, 1966, had been held only by whites. Like the system of job seniority described in the order and opinion of March 26, 1968, the recall and trainee systems tended to perpetuate the effects of past discrimination, and result in present discrimination, by preventing Negroes who were qualified to perform formerly white jobs from competing for them on the basis of their qualifications and length of service in the mill.

In addition, a series of incidents and changes in Crown's policy which have occurred since the January 1966 mergers operated to further impede Negroes' progress into formerly barred white jobs. For example, after the January 1966 merger of the lines of Negroes in the merged Utilities line of progression, Negroes were required to make daily written reports on the training they received for the job which had been the white entry job before the merger; no such requirement had been imposed on the whites then in that line.

When these incidents, together with the method of assignments on the Extra Board, the recall and trainee systems, and the job seniority system, and such matters as the waivers to the overhead crane, are considered together, it becomes clear that many of the institutional barriers to equal employment opportunities survived the mergers of lines of progression and continued to make Negroes' progress into and within better paying white lines of progression difficult and almost beyond reach until the institution of this lawsuit.

The fact that the continual effects of discrimination in job assignment and promotion, described above in these findings, continued beyond the date of the merger of the lines of progression demonstrates that the class of employees affected by these discriminatory practices included at least some Negroes hired since January 16, 1966. Since the most recent of the discriminatory practices clearly identifiable from the record—the matter of temporary assignments from the Extra Board—was corrected on February 14, 1968, the affected class includes all Negroes hired before that date, except for the six Negro employees hired since January 16, 1966, who in fact bid for and received formerly white jobs from the Extra Board.

### 20.

Prior to February 1, 1968, promotions within lines of progression were on the basis of "job seniority" wherein credit is based upon length of time spent in each job and no credit is given for length of service in the plant. When a vacancy

occurred in a job within a progression line, the qualified employee who had spent the greatest length of time in the job immediately below that in which the vacancy occurred was entitled to promotion, unless he waived or was disqualified for promotion, and similarly in each job slot below in the progression line. Demotions were also based on the time spent in a particular job. (Stipulation of facts, March 19, 1968).

### 20a.

White employees had accrued job seniority in the higher paying jobs at a time when Negroes were, because of their race, denied the opportunity to bid for and hold these higher paying jobs. Consequently, Negroes hired prior to January 1966 were frozen in the lower paying, less desirable jobs to which they had been assigned on the basis of race, while white employees of comparable length of service were assigned to higher paying, more desirable positions.

### 20b.

In an effort to remedy the discriminatory effects of these systems and to meet Crown's obligation under the contractual clauses required by Executive Order 11246, Crown and the Office of Federal Contract Compliance of the Department of Labor entered into agreements on March 19 and June 16, 1967, which contemplated that promotion to higher jobs at the Bogalusa mill would depend on a combination of job and plant seniority. This system was designed to remove some of the present consequence of the past discrimination by giving some weight to each employee's length of service in the mill.

### 20c.

Because the combination seniority system in part is dependent on the factor of job seniority, Negro employees who were, on the basis of their race, excluded from assignment in the "white" lines of progression will always be junior to the white employees hired contemporaneously with those who were assigned to the white progression lines earlier on the basis of their race.

### 20d.

A seniority system which is based in whole or in part upon length of service in a job would cause some qualified Negro employees, previously discriminated against, with greater mill seniority to be unsuccessful in bidding against junior white employees with less mill seniority for available job vacancies higher in the progression lines. The reason for this result is that junior white employees, on the basis of their race and color, had obtained greater job seniority in the jobs from which they seek to move than the senior Negro employees who, on the basis of their race and color, had previously been denied assignments to such jobs.

### 20e.

A seniority system which is based in whole or in part upon length of service in a job would cause some qualified Negro employees who are senior to white employees in length of service in the plant to remain beneath those employees in terms of pay and place in the lines of progression.

### 20f.

A seniority system based upon length of service in the mill will not result in so blocking or delaying the opportunities of such Negro employees to compete for and obtain jobs held by white employees of comparable ability in length of service in the mill.

### 21.

The uniform six-month residency requirement for promotion within lines of progression provided for in the June 16, 1967, Crown-OFCC Agreement was not imposed by Crown prior to the date of that Agreement. When applied uniformly to every job throughout the mill, the six-month residency requirement bears no relationship to the reasonable

needs of training and experience. The parties have stipulated to those jobs for which some residence is necessary to provide training and experience for the next higher positions in the lines of progression, and the length of time which may appropriately be required in each. That stipulation is accepted as factual by the Court.

22.

In accordance with the June 16, 1967, agreement between Crown and the OFCC, a six-month residency requirement was imposed before the employee was eligible for promotion to the vacant job immediately above the job to which he was permanently assigned.

23.

The six-month residency requirement is in excess of the amount of time necessary to learn some jobs in the mill and to qualify for promotion to some.

24.

The lengths of time listed in Joint Exhibit III are necessary to learn the jobs there indicated and to be fully qualified for promotion. (Third Stipulation of facts—Paragraph 1).

25.

Jobs listed below in the following lines of progression do not provide training necessary to the proper performance of the jobs higher in the line:

A. *Brown Stock Washers*
   Second Washer Operator

B. *Digesters*
   One, but not both, Gas-off Man or No. 1 Gas-off Man
   One, but not both, Capper New Digester or Capper Old Digester.

C. *Finishing Department*
   All jobs from Spare Hand to and including Five-Day Jitney Operator, provided, however, that the person bidding must have served a total of four weeks as a Spare Hand and/or in the other jobs below Five-Day Jitney Operator; and two, but not all of:
   First Cutter Helper
   Roll Wrap Machine Helper No. 9
   Rewinder Operator
   Cutting Operator
   Trimmer Operator
   Roll Wrap Machine Operator and No. 11 Rewinder Operator

D. *Paper Machine, Numbers 1, 2 and 4*
   Four, but not all:
   No. 1, Rewinder Helper
   No. 2, Fifth Hand
   No. 1, Finisher
   No. 1, Felt Checker, or
   No. 4, Fifth Hand provided that the employee has served as a Spare Hand and/or in one or more of these jobs for a total of seven months

E. *Paper Machine, Numbers 5, 6 and 7*
   Two, but not all:
   Utility Man
   Shaft Tailer
   Shaft Puller, provided that employee has served as a Spare Hand and/or in one of those jobs for a total of five months, at least four of which must be as a Shaft Tailer or Shaft Puller

F. *Stock Preparation*
   One, but not both:
   No. 2 Blend Tank Man or No. 1 Blend Tank Man

G. *Technical Department*
   One, but not both:
   5, 6 and 7 Wet End Tester or 1, 2 and 4 Wet End Tester

H. *Utilities Department*
   Outside Operator

I. *Wood Room*
   One, but not both:
   Chip Storage Operator or

Assistant Chip Storage Operator

And one, but not both:

Wood Unloader Flume or
Wood Unloader Chain

(See Second Stipulation of facts dated April 30, 1968).

**26.**

In accordance with promotional procedures in effect at Crown, no employee may promote to more than one job at a time above the job he permanently occupies. (Stipulation of facts, March 19, 1968).

**26a.**

It is common practice at Crown's Bogalusa mill for employees to be assigned temporarily to jobs higher in the lines of progression than the jobs to which they are permanently assigned, and regularly to spend substantial amounts of time working temporarily on these higher jobs. Time spent in substantial blocks temporarily in higher positions satisfies the need for training and experience provided by those jobs.

**27.**

The jobs below the following jobs in the following lines of progression do not provide training which is necessary to the proper performance of the jobs higher in those lines of progression:

A. *Brown Stock Washer:* Third Washer (Swenson Helper)

B. *Digester:* Capper—New Digester

C. *Paper Machine 1, 2, 4:* Spare Hand

D. *Stock Preparation:* Payloader Man

E. *Technical Department:* Pulp Mill Tester

F. *Utilities Department:* First Bark Boiler Helper

G. *Wood Room:* Utility Flume

(Second Stipulation of facts, April 30, 1968).

**28.**

The current Collective Bargaining Agreement between Crown and UPP and the present structure of the jobs within each line of progression require that all employees enter at the bottom of the progression line.

**29.**

Under the terms of the Collective Bargaining Agreement, any employee may transfer out of his present line of progression if he successfully bids for a permanent opening in an entry level job in another line of progression.

**30.**

The entry level jobs are the lowest paid jobs in each line of progression.

**31.**

Negro workers, employed prior to February 14, 1968, are, in some cases, permanently assigned to jobs not in any line of progression or to jobs in lines of progression in which the highest paid job pays less than the highest paid jobs in progression lines formerly restricted to whites. Some of these Negro jobs pay more than the entry level jobs in some progression lines formerly restricted to whites. In these circumstances, under the prevailing system, a Negro transferring to a formerly all-white line of progression must accept a reduction in pay.

**32.**

In January of 1966, Jesse Harris, Anderson Brown and Tom Brown, Negro employees holding the job slot of Wood Unloader-Chain (Lorrain Crane) in the Wood Room became eligible by virtue of the January 16, 1966, merger of lines of progression for promotion to the next higher job of Wood Unloader Flume (Electrical Overhead Crane), a job which until that time had been reserved for white employees. The job of Wood Unloader-Chain was the highest paying Negro job in the mill. It was

the only Negro job which was placed above a substantial number of white jobs when the lines were merged. Jesse Harris signed a waiver on January 17, 1966. In the course of the several days' training A. Brown and T. Brown received on the Electrical Overhead Crane during the week of January 16, white employees led both to believe that the job involved substantial electrical and mechanical hazards which in fact did not exist; they were also told by a supervisor that the company could not afford to fix the crane since a replacement for it had been ordered.

After approximately three days of training, both men were told by a supervisor that their training had been completed and that they should thereafter operate the Electrical Overhead Crane without assistance. At this point both Anderson and Tom Brown signed waivers to the Electrical Overhead Crane job. One or two days later at a meeting, Mr. Kwasny, the Assistant Superintendent in charge of the Wood Room, told both Browns that if they left their waiver in effect only "two or at most three" people would go around them. However, within three weeks, thirteen white employees who were junior to the Browns in the merged line of progression were treated by Crown and Local 189 as having acquired seniority over them for purpose of temporary and permanent promotions and demotions to the Wood Unloader-Flume job and all jobs above it in the Wood Room line of progression.

The net result of these waivers and subsequent seniority moves was in effect to place the Negro job and Wood Unloader-Chain at or near the bottom of the formerly all-white line of progression by making the Negro incumbents of that slot "junior" for purposes of promotion to the white employees who "went around this" although they were senior to them in length of service and responsibility.

The operation of the waiver system as applied to casual assignments was not, and is not now, a matter easily understood. Even Crown's personnel director had great difficulty on the witness stand explaining this system and at one point conceded that he really did not understand it which led to a company stipulation that one of the white employees who has been treated as senior to the Browns since the signing of these waivers in January 1966 is not and should never have been considered senior to them.

Further, Crown did not adequately explain the consequences of signing these waivers to the three Negro employees.

## CONCLUSIONS OF LAW

### 1.

The Court has jurisdiction of this action under the provisions of Sec. 707 (b) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–6(b).

### 2.

The scope of the class who has suffered from discrimination on the grounds of race in assignments, transfers, promotion, demotions and selection for training is as follows:

a) All Negro employees hired prior to January 16, 1966; and

b) All Negro employees hired after January 16, 1966 and prior to February 14, 1968, except such of those employees whose initial permanent assignments were to job classifications formerly within the exclusive jurisdiction of Local 189 while such employee remains in the line of progression, if any, in which he was permanently assigned as of the date of this decree or while he is in the first line of progression to which he voluntarily transfers or, if currently a member of the Extra Board, to which he bids within three years from the date of this decree.

### 3.

The various employment practices of the defendants, among them the continuation of the "job seniority" system,

the operation of the "recall" and "trainee" systems after the merger of lines of progression, the imposition in certain cases of requirements on Negro employees which had not been imposed on comparable white employees, the continuation of an Extra Board assignment system which resulted in racially discriminatory Extra Board assignments, and the failure of the company to prepare Negroes for promotion to white jobs which had previously been barred to them, all tended to perpetuate the results of past racial discrimination and to result in present discrimination, at least until the institution of this suit.

#### 4.

■ Title VII of the Civil Rights Act of 1964 requires that opportunities to hold better paying jobs be made available to all employees equally without regard to race. So long as there are institutional systems or procedures which deny to Negroes advancement to better paying, more desirable jobs which are held by whites with comparable mill seniority and ability, this legal obligation is not satisfied. The company is not required to forego its legitimate interest in maintaining the skill and efficiency of its labor force. Consistent with these two safeguards, however, removal of any structural impediments which delay the attainment by Negroes of jobs generally as good as those held by their white contemporaries or which force Negroes to pay a price for those opportunities are required by law to be removed.

#### 5.

For positions which provide training and experience which are necessary for the performance of higher jobs in the line of progression, the company may lawfully invoke a reasonable residency requirement—i. e., a period of time which must be served before an employee is eligible to bid for higher jobs in the line of progression. However, as the stipulation of the parties demonstrates, many of the jobs in the mill do not pro- vide any such training and experience, while in others the necessary training and experience can be obtained in less than six months. Accordingly, the residency requirement should not be a fixed period, such as six months for each job in the mill, but should be fixed at the minimum time required to provide necessary training and experience for each job, as stipulated to by the parties. Any longer period would unnecessarily retard the advancement of those in the class discriminated against and would be unlawful.

#### 6.

Negroes in the class discriminated against are entitled to compete for jobs on the basis of their competence and mill seniority, and thus may skip such jobs in the lines of progression which do not provide training and experience necessary to the performance of the job for which they are competing.

#### 7.

For the same reasons, Negroes in the class discriminated against are entitled to compete for jobs in lines of progression on the basis of their competence and mill seniority above the entry level in those lines where the present entry level job does not provide training and experience which are necessary to the performance of higher positions in the lines of progression.

#### 8.

Negroes in the class discriminated against may obtain the training and experience necessary to the performance of higher jobs in the line of progression, by virtue of their temporary assignments, which are common in the mill, at least where such assignments amount to 64 or more hours per month. Accordingly, qualified Negroes in the affected class who have served in a position in such increments for sufficient time to acquire the training and experience necessary for performance of higher jobs in the line of progression are entitled to bid for those jobs on the basis

of their mill seniority, notwithstanding they may never have held such a position on a permanent basis.

### 9.

The system for making Extra Board assignments in use prior to February 14, 1968, resulted in the assignment of Negroes generally to Negro jobs, and whites generally to formerly white jobs, and was in violation of Title VII of the Civil Rights Act of 1964. The system of assignment directed in the decree provides available assignments for jobs to be offered to Extra Board employees on the basis of mill seniority and for them to choose from among the assignments which remain available.

### 10.

■ After the merger of January 1966, the defendant Crown failed to take the necessary steps to ensure that the Negro employees in the Wood Unloader-Chain jobs who became newly eligible to bid on the white job of Wood Unloader-Flume were adequately trained for that job, and further, failed to ensure that those Negro employees fully understood the possible consequences of the waivers they signed. The result of this default by Crown—nullification of the only significant integration of jobs brought about by the merger of the Wood Room line of progression—requires that those waivers not be considered in any future setup or promotion made in the Wood Room line of progression.

### 11.

■ Any practice, system, procedure or policy that denies a member of the affected class promotion to a vacant job which he is qualified to perform, where he is senior in terms of continuous employment with the company to other eligible employees and where he has not previously waived or otherwise disqualified himself for promotion or advancement, is a "term, condition and privilege of employment" that discriminates against Negro employees on the

basis of race, in violation of Sec. 703(a) of the Civil Rights Act of 1964. For this reason, the following practices are unlawful where they operate to deny promotion to a member of the affected class:

a) A job seniority system of promotion within a line of progression, or any promotional system based on a standard other than total employment seniority in the mill;

b) The prohibition on promotions more than one job slot above the employee's present job, if the intermediate job or jobs do not afford any training necessary for proper performance in the jobs higher in the line of progression;

c) The prohibition on promotions more than one job slot above the employee's present job if, through temporary assignments to the intermediate job or jobs, the employee has acquired the necessary training in that job to the proper performance in the jobs higher in the line of progression;

d) The requirement that a member of the affected class enter a line of progression a level below the lowest job which provides training necessary to perform the jobs higher in the progression line;

e) The requirement that a member of the affected class spend any specific period of time in a job in excess of the time necessary to learn the job before he is eligible for promotion.

### 12.

■ The policy of the defendants in deterring Negro employees from transferring to formerly all-white lines of progression by requiring these employees to suffer reduction in wages and the loss of all promotional security as a condition of transfer constitutes a "term, condition and privilege of employment" that discriminates against Negro employees on the basis of race, in violation of Sec. 703(a) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–2(a).

**13.**

■ The maintenance of segregated local unions herein violates Sec. 703(c) of the Civil Rights Act of 1964. A consent decree merging these two unions under certain conditions has been signed on September 11, 1968, and approved by this Court.

**14.**

The defendants have intentionally engaged in the unlawful employment practices described herein within the meaning of Sec. 706(g) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–5(g).

**15.**

None of the unlawful employment practices described herein result from a bona fide seniority or merit system within the meaning of Sec. 703(h) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e–2(h), but rather are the result of a seniority or merit system that discriminates against Negro employees employed by Crown prior to February 14, 1968, on the basis of their race.

**DECREE**

This cause having come for a hearing on the merits of the complaints of the plaintiff, United States, and the plaintiff-intervenors, Anthony Hill, David Johnson, Sr., and Local 189A, United Papermakers and Paperworkers, AFL–CIO, CLC,

It is now the order of the court that, for the reasons assigned, the relief sought should be, and the same is hereby, granted as follows:

The defendants, Crown Zellerbach Corporation, Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC, and the United Papermakers and Paperworkers, AFL–CIO, CLC, their officers, agents, employees, servants and all persons and organizations in active concert or participation with them, are hereby permanently enjoined and restrained from discriminating against the Negro employees of the defendant Crown Zellerbach Corporation's papermill at Bogalusa, Louisiana, in violation of Title VII of the Civil Rights Act of 1964, and in violation of the obligations imposed pursuant to Executive Order 11246, and in particular,

It is ordered that the defendants' prior system of "job seniority," and any other seniority system designed to discriminate against Negro employees at said paper mill, or having the effect of so discriminating, shall remain permanently abolished insofar as such systems may apply to the temporary and permanent job assignment, the temporary and permanent promotion and demotion, and the selection for training of the following class of employees in competition with other employees at said paper mill:

I. *Affected Class:*

(1) All Negro employees hired prior to January 16, 1966, shall have all rights contained in this Decree.

(2) All Negro employees hired after January 16, 1966, and prior to February 14, 1968, except such of those employees whose initial permanent positions were in job classifications formerly within the exclusive jurisdiction of Local 189, shall have the rights set forth in paragraphs II, III, IV, V, VI and VII herein while such employee remains in the line of progression, if any, in which he permanently held a permanent position as of the date of this Decree or while he is in the first line of progression to which he voluntarily transfers or, if currently a member of the Extra Board (labor pool), to which he bids within three years from the date of this Decree, and;

II. The said defendants are permanently ordered to continue in the place of such "job seniority" or similar systems, a system of "mill seniority," with respect to such casual temporary and permanent job assignments, temporary and permanent demotions, and selection for training of Negro employees in the above affected class, as follows:

(1) Total mill seniority (i. e., the length of continuous service in the mill)

alone shall determine who the "senior" bidder or employee is for purposes of permanent or thirty-day promotions, or for purposes of demotion in all circumstances in which one or more of the competing employees is a Negro employee in the specified class;

(2) For jobs which operate only one shift per day, promotions to fill casual or vacation vacancies will be made on the same basis as permanent and thirty-day promotions;

(3) For jobs which operate more than one shift per day, promotions because of casual or vacation vacancies will be awarded to the senior (as determined in (1) above) qualified man on the shift and/or machine where the vacancy exists;

(4) Except as otherwise provided by this order the waiver provisions set forth in the labor agreement shall remain in effect. Persons promoted shall go around a waived position in any job slot, and except as set forth in ¶ XII below, persons demoted shall likewise go around such a position on the way down;

(5) Qualified employees shall be selected for training on the same basis as for promotion described above.

It is the further order of the court that the following shall apply:

III. *Residence*

(1) The jobs in the paper mill for which residence requirements are valid, and the appropriate residence requirements for each are listed in attached Appendix A.

(2) Time spent on jobs on casual or temporary assignments shall be counted toward residency for those jobs if such time is equal to, or exceeds, 64 hours in any calendar month, in which event the total hours actually worked shall be counted; provided, however, that time spent on temporary or casual assignments within any calendar month which does not amount to 64 hours or more on any job shall count toward satisfying the residence requirement, if any, of the job to which the employee is permanently assigned.

(3) Time worked on a job on a permanent basis, or casual or temporary basis as defined in (2) above, shall satisfy residency requirements as follows:

a) 173⅓ hours actually worked shall satisfy one month of residency.

b) 40 hours actually worked shall satisfy one week of residency.

(4) Where none of the candidates being considered for the promotion has fulfilled the residency and/or Job Instruction Training requirements, the company may fill such positions with the candidate who has completed the greatest percentage of such requirements.

It is the further order of the court that, with respect to the affected class as defined in ¶ I, the following shall apply:

IV. *Lines of Progression:*

Except as provided below, promotions shall be in accordance with the presently constituted lines of progression:

A. *Bypassing Jobs*

(1) With respect to permanent promotions and temporary and casual setups, employees if qualified who are members of the affected class may bypass the following job classifications in the indicated lines of progression:

(a) *Brown Stock Washers:*
Second Washer Operator

(b) *Digesters:*
One, but not both, Gas Off Man or No. 1 Gas Off Man
One, but not both, Capper New Digester or Capper Old Digester

(c) *Finishing Department:*
All jobs from Spare Hand up to and including Five-Day Jitney Operator, provided however that the employee must have served a total of four weeks as a Spare Hand and/or in another job up to Five-Day Jitney Operator

All or any of the following when bidding on the Crane Operators job:

Cutter Operator

Trimmer Operator

Roll Wrap Machine Operator and No. 11 Rewinder Operator

plus two, but not all of the following:

Roll Wrap Machine First Helper or No. 9 Rewinder Operator or Cutter Helper

In that branch of the Finishing Department progression line which contains the jobs of Cutter Operator, Trimmer Operator and First Cutter Helper, an employee may bypass the job of Trimmer Operator. In that branch of the Finishing Department progression line which contains the jobs of Roll Wrap Machine Operator, No. 11 Rewinder Operator, No. 9 Rewinder Operator and Roll Wrap Machine First Helper, an employee may bypass Roll Wrap Machine First Helper provided he also bypasses Roll Wrap Machine Operator, or he may bypass No. 9 Rewinder Operator provided he also bypasses No. 11 Rewinder Operator.

(d) *Paper Machine, Nos. 1, 2 and 4:*

Four, but not all of the following:

No. 1, Rewinder Helper

No. 2, Fifth Hand

No. 1, Finisher

No. 1, Felt Checker, or

No. 4, Fifth Hand,

provided that the employee has served as a Spare Hand and/or in one or more of the above jobs other than Spare Hand for a total of seven months, at least six of which must have been served in one of the above listed jobs other than Spare Hand.

(e) *Paper Machines, Nos. 5, 6 and 7:*

Two, but not all of the following:

Utility Man

Shaft Tailer

Shaft Puller

provided that the employee has served as a Spare Hand and/or in one of the above jobs for a total of five months, at least four of which must be as a Shaft Tailer or Shaft Puller.

(f) *Stock Preparation:*

One, but not both:

No. 2 Blend Tank Man or

No. 1 Blend Tank Man

(g) *Technical Department:*

One, but not both:

5, 6 and 7 Wet End Tester or

1, 2 and 4 Wet End Tester

(h) *Utilities Department:*

Outside Operator

(i) *Wood Room:*

One, but not both:

Chip Storage Operator or

Assistant Chip Storage Operator

and one, but not both:

Wood Unloader-Flume or

Wood Unloader-Chain

(2) When a permanent, temporary or casual vacancy occurs in a job, the following employees, if qualified, are eligible to fill it:

(a) any incumbents in the job immediately below the vacant job,

(b) and any member of the affected class who is eligible to bypass all of the jobs between the job to which he is permanently assigned and the job in which the vacancy exists.

(3) Mill seniority, as set forth in II (1–4) shall determine the selection of the employee to fill the vacancy from the above eligible employees if a qualified member of the affected class is eligible to bid for the vacancy.

B. *Entry to Progression Lines*

(1) With respect to permanent assignments, members of the affected class may bid for entry into the following indicated progression lines at points above the normal entry point only at the jobs listed below or if a vacancy in a line initially occurs in a job below the listed jobs, members of the affected class may bid for entry at the position where that vacancy occurs:

(a) *Brown Stock Washer:* Third Washer (Swenson) Helper

(b) *Digesters:* Capper — New Digester

(c) *Paper Machine 1, 2, 4:* Spare Hand

(d) *Stock Preparation:* Payloader Man

(e) *Technical Department:* Pulp Mill Tester

(f) *Utilities:* First Bark Boiler Helper

(g) *Wood Room:* Utility Flume

(2) When members of the affected class are entitled to bid for entry into a progression line above the normal entry point as provided in ¶ 1, above, the following persons are eligible to bid:

(a) all members of the affected class whether or not they are then in progression lines

(b) all employees permanently assigned to the job immediately below the vacant job.

(3) When a member of the affected class bids, mill seniority as set forth in II(1) shall determine among qualified bidders in the competition contemplated in (2) above.

C. *Residency by Virtue of Temporary Assignments*

(1) A member of the affected class may bid for a vacancy above an intermediate job through which, in accordance with the terms of this order, he would otherwise be required to progress provided:

(a) he has fulfilled the residency and Job Instruction Training (J.I.T.) requirements for the job he currently holds.

(b) he has fulfilled the residency and J.I.T. requirements for the above-mentioned intermediate job.

(c) he has served on temporary assignment in the job for which he is bidding a sufficient time to meet one-third of the residency requirements for such job. Such one-third

residency shall not be required on jobs which have not customarily involved any training in that job while permanently assigned to the lower job.

(2) Only one intermediate job as defined in ¶ 1 above at a time may be passed in this manner, but jobs which are blocked by waivers shall not be counted for this purpose.

(3) For purposes of this section only, in the Utilities Department line of progression the First and Second Bark Boiler Helper jobs shall be considered as one job for the purpose of determining eligible bidders for higher jobs in this line.

(4) Members of the affected class who are eligible to bid for a vacancy under this ¶ C shall bid on the basis of mill seniority in competition with all other persons eligible to bid for the vacancy.

V. *Extra Board Assignments*

A. Crown shall post two copies of the list of available jobs at least twenty minutes prior to the start of the shift. Extra Board requests coming in after posting will be noted at the end with the time the request came in. The company will endeavor to have all requests received prior to making any assignments.

B. Such lists will show the available jobs in order of decreasing rate of pay.

C. No offers of assignments will be made until ten minutes after the posting of the lists.

D. Immediately after the posting of the lists and prior to any assignments being made, employees meeting the shift who have recall rights to any job listed must indicate to the clock room attendant whether or not they wish to exercise such recall rights. Employees may be required to stay on vacation and weekly line-ups as is the present practice, in which case those jobs will not be available for assignment if the employee filling them meets the shift.

E. The senior man meeting the shift, in terms of mill seniority, will be given the choice of all the then available jobs.

F. Succeeding offers will be made to those meeting the shift in order of their decreasing mill seniority.

G. As each employee accepts a job, he shall sign his name beside the job he accepts and write in the number which shows the order in which he was called (e. g., 1st, 2nd, etc.).

H. Requests coming in after posting of the lists and the start of assignments shall be immediately made available to those meeting the shift who have not already received assignments.

## VI. *Red Circling*

A. Members of the affected class who qualify to transfer will be allowed to transfer to jobs in other lines of progression for a period of three years from the date of this Decree with rate of pay protection as follows:

(1) When a member of the affected class transfers to a job in another line of progression in which the highest paying job exceeds the rate for the highest paying job in the line transferred from,

He shall continue to be paid the straight time hourly rate of pay he was receiving in his permanent position immediately prior to transfer (herein called "Red Circle Rate") unless or until:

(i) he is permanently assigned to a position paying a higher rate, or (ii) he waives or is disqualified from promotion.

In either event, all "Red Circle" rights cease.

(2) In no event shall such "Red Circle Rate" exceed $3.00 per hour nor shall the privileges of this ¶ VI be available to employees transferring to the Yard or Utilities Departments.

(3) Members of the affected class in the Utilities Department and Yard Department may receive their "Red Circle Rate" if they successfully bid (i. e., they are the senior qualified bidder), into another line of progression where the top job has a rate of more than $3.26 per hour.

(4) The "Red Circle Rate" shall apply only to one voluntary transfer for each member of the affected class.

(5) However, if by shutdown or other event over which he has no control, a "Red Circled" member of the class is "bumped" out of the line to which he transferred, excluding the Technical Department, he shall retain his "Red Circle Rate" subject to (1) (i) and (ii) above, and he may

(a) if the "bump" is temporary, return to the Extra Board where he may:

(i) exercise his recall rights, if he meets the shifts, to temporary work in the line of progression transferred to; or failing that, he shall

(ii) for a period of two years from date of transfer based on mill seniority, if he meets the shifts, work in the entry level job in the line he transferred from, or

(b) if within a period of two years from date of transfer the "bump" is permanent, immediately return to the position from which he transferred and/or transfer to another line of progression in which the highest paying job exceeds the rate for the highest paying job in the line originally transferred from, subject to (3) above if he is transferring from the Utilities or Yard Departments.

## VII. *Training*

A. Crown will provide training, in order of seniority, to qualified employees for all jobs to which they are eligible for permanent, temporary or casual assignments.

B. Members of the affected class will be given the training necessary to allow

them to bid for jobs for which they would otherwise be eligible. Such training for each successive job will in any case commence no later than completion of 50% of the residency requirements in the job below such job for which training is to be given, provided there is reasonable likelihood that the employee's seniority will allow him to fill such job on a casual, temporary or permanent basis once the training has commenced.

## VIII. *Publicity and Records*

Defendant Crown Zellerbach Corporation shall publish and post the terms of this Decree in prominent places throughout the Plant, and will take reasonable steps to explain it to its employees. Such defendant shall also maintain appropriate record of personnel assignments and actions for inspection at reasonable times, after 15 days written notice by the plaintiff or plaintiff-intervenors.

## IX. *Qualifications*

The present right of defendant Crown Zellerbach Corporation to refuse promotions to unqualified employees is not affected by this Decree.

## X. *Recall*

Recall and J.I.T. provisions as set forth in the letters of agreement between defendant Crown Zellerbach Corporation and the OFCC will continue to apply.

## XI. *Limitation of Relief*

The terms and provisions of this Decree shall apply only to Crown Zellerbach Corporation's paper mill at its Bogalusa division. Plaintiff and plaintiff-intervenors are not entitled to any other relief in this case on this record in addition to that specified in this Decree.

## XII. *Waivers*

1. Waiver provisions of the collective bargaining agreement will continue to apply except that in the case of demotion, if the man in the higher job is senior in terms of mill seniority to the man below him who has previously waived, the employee in the higher job will not be required to demote around the man who waived but will be con-sidered senior where a member of the affected class is involved.

2. Any employee of the affected class who elects to follow the established line of progression and not bypass a job as provided in ¶ IV above shall not be considered to have waived promotion and need not sign a waiver.

3. An employee who has established rights around another employee higher in such progression line due to a waiver situation shall not prevent the promotion of the waived employee, who has subsequently been reinstated, unless the employee who established rights around the waived employee would next be entitled to the promotion on the basis of his mill or job seniority, whichever is applicable.

## XIII. *Demotions*

In case of demotion all employees shall demote straight down the lines of progression they are in, except that where an employee in the affected class has bypassed any of the jobs listed below and has not completed the J.I.T. and Residency requirements for them, then he shall bypass such jobs on the way down upon demotion.

1. *Finishing Department*
   Cutter Operator
   Trimmer Operator
   Roll Wrapping Machine Operator
   No. 11 Rewinder Operator

2. *Utilities Department*
   Outside Operator

3. *1, 2 and 4 Paper Machines*
   No. 1 Felt Checker

XIV. The waivers to the job of Wood Unloader-Flume signed in January 1966 by persons in the affected class who are permanently assigned to the job of Wood Unloader-Chain (J. Harris, A. Brown and T. Brown, Sr.) shall from the date of this order be of no further force and effect and all future training, promotion and demotions, casual, temporary or permanent, shall be made on the basis of mill seniority as provided in ¶¶ II, IV and VII of this Decree.

XV. *Union Agreement and OFCC Agreement*

The collective bargaining agreement now in effect between the defendants shall remain in full force and effect, except insofar as it is inconsistent with this Decree. The defendants are enjoined and restrained from interfering and failing to comply with the agreement of March 19, 1967, as modified by the agreements of June 16, 1967, and January 3, 1968, to the extent that they are applicable to the defendant Crown's Bogalusa paper mill division between the defendant Crown Zellerbach Corporation and the Office of Federal Contract Compliance of the United States Department of Labor to the extent such agreements are not in conflict with this Decree.

XVI. The Defendant Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC, and United Papermakers and Paperworkers, AFL–CIO, CLC, their officers, agents, members, employees, servants, and all persons and organizations in active concert or participation with them, are ENJOINED and RESTRAINED from interfering with or hindering, by striking, threatening to strike, harassment or otherwise, the compliance by the defendants with the foregoing provisions of this Decree.

XVII. Plaintiff and plaintiff-intervenors shall recover their costs from the defendants. As part of their costs, plaintiffs-intervenors shall recover from the defendants a reasonable attorneys' fee. If after twenty days the parties have not agreed upon a fee, and its proper allocation among the defendants, the Court will allow it and allocate it upon consideration of a statement of services filed and served upon counsel for the defendants, who shall have ten days to serve and file a response.

## APPENDIX A

### ASPHALT DEPARTMENT

| | |
|---|---|
| Asphalt Machine Operator<br>Color Machine Operator | 18 months total— with minimum of two months on each |
| Asphalt Machine First Helper<br>Color Machine First Helper | 4 months total on each |
| First Helper—Rewinder | 1 month |
| Second Helper—Rewinder | 1 month |

### AUTO MECHANICS

| | |
|---|---|
| Auto Mechanic Helper | 30 months |

### ATTRITION MILL & ADDITIVES

| | |
|---|---|
| Attrition Mill Asst. Operator | 6 months |
| Additives Operator | 4 months |
| Additives Helper | 6 months |

### BROWN STOCK WASHER

| | |
|---|---|
| Second Washer Operator | 1 month |
| First Helper | 12 months |
| Second Helper | 6 months |
| Third Helper | 6 months |

### CARPENTER CREW

| | |
|---|---|
| Carpenter Helper | 30 months |

### DIGESTER ROOM

| | |
|---|---|
| Cook—New Room | 1 month |
| Pandia Operator | 8 months |
| Gas Off Old Digester | 9 months |
| Gas Off New Digester | 8 months |
| No. 1 Gas Off Man <br> Gas Off Man | } 6 months in either |
| Pandia Helper | 4 months |
| Measuring Tank Man | 4 months |
| Capper—New Digester <br> Capper—Old Digester | } 3 months in either |

### ELECTRICIANS

| | |
|---|---|
| Helpers | 30 months |

### EVAPORATOR ROOM

| | |
|---|---|
| Assistant Operator | 3 years |

### ENGINE MACHINISTS CREW

| | |
|---|---|
| Engine Machinist Helpers | 30 months |

### TINSMITH CREW

| | |
|---|---|
| Tinsmith Helpers | 30 months |

### FINISHING DEPARTMENT

| | | |
|---|---|---|
| | Cutter Operator | 1 week |
| A | Trimmer Operator | 1 week |
| | First Cutter Helper | 4 weeks |
| | Roll Wrapping Machine Operator | 1 week |
| | No. 11 Rewinder Operator | 1 week |
| B | | |
| | No. 9 Rewinder Operator | 4 months |
| | Roll Wrapping Mach. First Helper | 4 weeks |
| | 5-Day Jitney Driver | 2 weeks |
| | Core Recutter | 2 weeks |
| | Spare Hand | 2 weeks |

### INSTRUMENT CREW

| | |
|---|---|
| Helper | 30 months |

### VALVE REPAIRS

| | |
|---|---|
| Helper | 30 months |

### LIME RECOVERY & CAUSTIC ROOM

| | |
|---|---|
| Lime Burner—No. 4 Kiln | 12 months |
| Filter Man | 9 months |

## MACHINE SHOP CREW

| | |
|---|---|
| Helper | 30 months |

## MILLWRIGHT CREW

| | |
|---|---|
| Millwright Helper | 30 months |
| Turbine Repair Helper | 30 months |

## MILL SUPPLY PROGRESSION LADDER

| | |
|---|---|
| Receiving Clerk | 6 months |
| Jr. Receiving Clerk | 6 months |
| Warehouseman | 6 months |
| Jr. Supply Room Clerk | 6 months |

## MACHINE LINE OF PROGRESSION   (1–2–4 Machines)

| | |
|---|---|
| No. 2, 4, 1 Machine Backtender | 18 months |
| No. 2, 4 Machine Third Hand | 12 months |
| No. 1 Machine Rewinder Man | 12 months |
| No. 2 Machine Fourth Hand | 4 months |
| No. 4 Machine Fourth Hand | 8 months |
| No. 4 Machine Fifth Hand | |
| No. 1 Machine Felt Checker | |
| No. 1 Machine Finisher | 6 months in any |
| No. 2 Machine Fifth Hand | |
| No. 1 Machine Rewinder Helper | |
| Spare Hand | 1 month |

## MACHINE LINE OF PROGRESSION   (5–6–7 Machines)

| | |
|---|---|
| No. 5, 6, 7 Bank Tender | 18 months |
| No. 5, 6, 7 Third Hand | 14 months |
| No. 5, 6, 7 Fourth Hand | 12 months |
| No. 5, 6, 7 Fifth Hand | 4 months |
| No. 5, 6, 7 Shaft Tailer | 4 months in any |
| No. 7 Shaft Puller | |
| Spare Hand | 1 month |

## PIPEFITTERS

| | |
|---|---|
| Pipefitter Helper | 30 months |

## RECOVERY ROOM

| | |
|---|---|
| No. 20 Operator | 24 months |
| No. 20 Asst. Operator | 24 months |
| No. 19 Operator | 24 months |
| No. 18 Operator | 24 months |
| No. 19 Helper | 12 months |
| No. 18 Helper | 15 months |
| Combination Helper | 4 months |
| Utility Man | 4 months |

## SCALES

| | |
|---|---|
| Stencil Man | 4 weeks |

## SCREEN ROOM

| | |
|---|---|
| No. 1 Screen Man | 12 months |
| Storage & Thickener Man | 6 months |

## PULP MILL SPARE HANDS

| | |
|---|---|
| Spare Hands | 2 months |

## SHIPPING & WAREHOUSING

| | |
|---|---|
| Asst. Shipping Clerk | 3 months |
| Scaleman | 6 months |
| Round Clock Jitney Driver | 6 months |
| Car Bracers | 3 months |
| Shipping Laborer & Jitney Driver | 2 weeks |
| Lead Loader | 1 week |

## STOCK PREPARATION

| | |
|---|---|
| No. 7 Blend Tank Man | 6 months |
| No. 5 & 6 Blend Tank Man | 6 months |
| No. 2 Blend Tank Man<br>No. 1 Blend Tank Man | 6 months in either |
| Hydrapulper Man | 3 months |
| Payloader Man | 3 months |
| Broke Beater Man 5, 6, 7 | 1 week |
| Broke Beater Helper, 5, 6, 7 | 2 weeks |

## TECHNICAL DEPARTMENT PROGRESSION LADDER

| | |
|---|---|
| Asst. Bleach Operator | 18 months |
| Bleach Liquor Operator | 6 months |
| Asst. Chemical Plant Operator | 6 months |
| Sulphur Chemicals Hpr. | 9 months |
| Utility Man | 1 month |
| Head Tester 5–6–7 | 3 months |
| 1–2–3–4 Tester | 6 months |
| 5–6–7 Tester | 6 months |
| 1–2–3–4 Second Tester | 2 months |
| 5–6–7 Wet End Tester<br>1–2–3–4 Wet End Tester | 2 months in either |
| Pulp Mill Tester<br>Spare Hands | 6 months total |

## TECHNICAL DEPARTMENT

| | |
|---|---|
| Colorist Technician | 24 months |
| Technical Sample Man | 12 months |

## TRACK CREW MILL

| | |
|---|---|
| Track Laborer | 3 months |

## LIVINGSTON TRACK

| | |
|---|---|
| Car Operator | 6 months   * |
| Section Man | 3 months |

> \* 6 months unless longer needed by law, regulation or external obligation (contracts, etc.)

## TRAIN CREW   *

| | |
|---|---|
| Fireman | GMO–ICC Exams (usually 4–5 years) |
| Engineer | 3 yrs. before going to Engineer Mainline—must pass GMO–ICC Tests |
| Fireman | 18 months plus exams to go to Engineer in yard |
| Spare Hand | 4 months to be qualified for Fireman & Switchman in yard |
| Brakeman | GMO–ICC Test (usually 4–5 years) |
| Conductor | 3–4 yrs. plus GMO–ICC Exam |
| Switchman | 18 months plus GMO Exams before going to Conductor Yd. |

> \* Subject to law, regulations & external obligation (contracts, etc.). The legal time limit unless there is none, in which case the above applies.

## UTILITIES

| | |
|---|---|
| Turbine Room Operator | 6 months |
| Turbine Operator 900 lb. Plant | 4 months |
| Power House Water Tender | 6 months |
| Gas Boiler Operator | 6 months |
| Bark Boiler Operator | 3 months |
| No. 20 Boiler Water Tender | 3 months |
| Rec. Boiler Water Tender | 2 months |
| Turbine Room Asst. | 6 months |
| Outside Operator | none |
| Boiler Room Helper | 6 months |
| 1st Bark Boiler Helper | 3 months |
| 2nd Bark Boiler Helper | 3 months |
| Boiler Room Utility Man | 4 months |
| Fuel Handler | 2 months |
| Turbine Room Utility Man | 2 months |

## WELDERS

| | |
|---|---|
| Apprentice Welder | 30 months |

## WOOD ROOM

| | |
|---|---|
| Asst. Foreman | 1 year |
| Wood Unloader-Flume<br>Wood Unloader-Chain | } 6 months in either |
| Chip Storage Operator<br>Asst. Chip Storage Operator | } 6 months in either |
| Chipper Operator | 6 months |
| Chip Dispatcher | 10 weeks |
| Utility Flume | 3 weeks |
| Utility Chain | 5 weeks |
| Day Utility | 2 weeks |

## YARD DEPARTMENT

(Janitor Line)

| | |
|---|---|
| Janitor | 6 months |

(Crane Operator Line)

| | |
|---|---|
| Yard Lead Man | 6 months |
| Mobile Equipment Operator | 1 month |
| Dempster Dompster Driver | 1 month |
| Winch Truck Driver | 1 month |
| Payloader Driver | 6 months |
| Dump Truck Driver | 1 month |
| Winch Truck Helper | 1 month |
| Riggers | 6 months |
| Concrete Finisher | 3 weeks |
| Pavement Breaker | 3 weeks |

(Clean-Up Pool Line)

| | |
|---|---|
| Sweeper Operator | 7 months total on sweeper and/or cleanup pool before going to Lead-man |
| Clean-up Man | 1 month |

(Brickmason Line)

| | |
|---|---|
| Brickmason Helper | 30 months |