Dorothy P. ROBINSON et al., Plaintiffs,

v.

LORILLARD CORPORATION, Tobacco Workers International Union, AFL–CIO, and Tobacco Workers International Union, AFL–CIO, Local Union No. 317, Defendants.

No. C–141–G–66.

United States District Court,
M. D. North Carolina,
Greensboro Division.

March 12, 1970.

William Bennett Turner, New York City, J. LeVonne Chambers, Charlotte, N. C., Robert Belton, New York City, and Sammie Chess, Jr., High Point, N. C., for plaintiffs.

Thornton H. Brooks, Greensboro, N. C., C. Allen Foster, Robert G. Sanders, Charlotte, N. C., and Larry Thomas Black, Charlotte, N. C., for defendants.

David W. Zugschwerdt, for intervenor Legal Employment Opportunity Commission.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GORDON, District Judge.

In order to expedite a decision in this case, the customary practice of writing a Memorandum Opinion will not be followed. Where appropriate, the Court has adopted proposed findings and conclusions of the parties.

This cause is brought under the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e et seq., to enjoin the defendants from violating the Act. After institution of the action, plaintiffs asked that back pay be awarded.

Following trial by the Court without a jury, counsel for the parties filed proposed findings of fact and conclusions of law and briefs. Later, oral argument was presented.

Having considered the evidence, briefs, oral argument and entire official file, pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes Findings of Fact and Conclusions of Law as follows:

### FINDINGS OF FACT

1. Plaintiffs are citizens of the United States and of the State of North Carolina, residing in Greensboro, North Carolina. By order of the Court, filed March 27, 1967, this action was held to be a class action under Rule 23(a), (b)(2) of the Federal Rules of Civil Procedure. The represented class was designated as those Negro employees who, prior to May 31, 1962, were hired into the blending, cutting, service, and shipping and receiving departments of The P. Lorillard Company plant in Greensboro, North Carolina.

2. Defendant Lorillard Corporation (Lorillard) is a corporation incorporated under the laws of the State of Delaware, and is transacting business in the State of North Carolina by the operation of a cigarette manufacturing plant in Greensboro, North Carolina. Lorillard is an employer in an industry affecting interstate commerce and has more than 100 employees. During the course of this action, the official corporate name of Lorillard was changed from "P. Lorillard Company" to "Lorillard Corporation."

3. Defendants Tobacco Workers International Union, AFL–CIO, and its Local No. 317 (the "Union") are unincorporated international and local labor organizations, respectively, and are the bargaining representatives of the employees of Lorillard for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment. The Union is engaged in an industry affecting interstate commerce and has more than 100 members.

4. On December 28, 1965, the eight named plaintiffs filed charges before the Equal Employment Opportunity Commission pursuant to the provisions of § 706 (a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(a). These charges raised the issues set forth in the complaint filed in this cause.

5. Plaintiffs received letters dated June 30, 1966, from the EEOC notifying them that they were entitled to file suit in federal district court under Title VII of the Act. The complaint in this action was filed on August 1, 1966, within thirty days after receipt of appropriate notice from the Equal Employment Opportunity Commission.

6. Lorillard opened its Greensboro plant in 1956 and began operating nine production departments which perform-

ed (and still perform) the following functions:

(a) *Blending*—Receipt of leaf tobacco and processing of blends according to the brands of cigarettes produced.

(b) *Cutting*—Shredding of blended tobacco prior to the cigarette making process.

(c) *Regular Making*—Manufacture of non-filter cigarettes.

(d) *Filter Making*—Manufacture of filter cigarettes and filter rods.

(e) *Packing*—Wrapping, cellophaning, packing and casing of cigarettes.

(f) *Export*—Manufacture of Turkish blend cigarettes and packing of cigarettes shipped outside the continental United States.

(g) *Shipping and Receiving*—Receipt of incoming material used in the fabrication and packing of cigarettes and shipping of the finished product to distribution points.

(h) *Service*—Cleaning and overall sanitation.

(i) *Maintenance, Boiler Room and Air Conditioning*—Maintenance of all equipment and installation of new equipment.

7. In recruiting and hiring employees for the production departments, the Company relied on the North Carolina Employment Service offices in Greensboro. At that time, the Service maintained one office primarily to serve Negroes and one primarily to serve whites. Lorillard instructed the Employment Service to refer Negro applicants for certain jobs and departments and white applicants for certain other jobs and departments.

8. Negroes were hired only for the blending, cutting, service and shipping and receiving departments. White persons were hired for the regular making, filter making, packing, maintenance and export departments. The departments to which black employees were assigned were generally less desirable in that the pay was lower and the jobs less challenging.

9. The filter making department and the packing department are the largest departments and the departments presenting the most rapid promotional opportunities. The maintenance department has generally the highest-paying jobs in the plant, while the relatively low-paying jobs are predominently in the service, blending, cutting and shipping and receiving departments.

10. Lorillard's discriminatory hiring policy continued until the summer of 1962. Two hundred seventy-eight black employees were hired into the blending, cutting, service and shipping and receiving departments from the opening of the plant to May 31, 1962.

11. The Tobacco Workers International Union is an international organization of locals representing persons employed in the tobacco industry. About three months after the Greensboro plant began operations, Local 317 of the Tobacco Worker's International Union was formed and an organization campaign began which culminated in an election and certification of the Local by the NLRB as the bargaining agent on October 24, 1956.

12. Local 317 was organized with both white and Negro members, and was the first integrated Local in the tobacco industry. The initial Vice President of the Local was a Negro and two of the seven members of the first negotiating committee were Negroes. Negro employees have served as officers of the Local Union, including membership on the negotiating committee, since its inception.

13. The Local represents all persons employed in the various departments outlined above, males and females, whites and Negroes, Union members and nonmembers. The exact racial composition of the membership is unknown because the Local keeps no records which indicate race or color. There is no question, however, that Negroes comprise a minority of the membership.

14. The Local Union is regulated by the Constitution of the Tobacco Workers International Union as well as by the

by-laws of the Local Union. The International Union provides a field representative to assist the Local Union in the conduct of its daily affairs as well as assisting in the negotiation of a contract. Although two field representatives assisting Local 317 personally favored plant-wide seniority, the International Union did not attempt to dissuade the Local Union from adopting a departmental seniority system.

15. The Union's seniority proposal, which ultimately became the seniority clause in the initial collective bargaining agreement, provided for departmental and job seniority, that is, promotions and layoffs were determined on the basis of an employee's length of service in a particular job group in a department. The effect of this provision was that an employee with more "plant" and more departmental seniority might be laid off before one with less "plant" and departmental seniority but more job seniority. There was no job bidding procedure and interdepartmental transfers were prohibited.

16. Under the seniority system embodied in the 1957 agreement, promotions, layoffs, cutbacks and recall rights were determined on the basis of departmental seniority, job seniority and sex:

(a) Seniority rights were limited to the department in which an employee was hired and worked.

(b) Promotions, layoffs, cutbacks and recall rights were determined by allocating jobs to the most senior man or woman in a given department within a job classification.

(c) Certain jobs were open only to women and certain other jobs were open only to men.

In the 1957 agreement, *transfers from one department to another were explicitly prohibited. Thus, employees were locked into the departments in which they were hired.* Union negotiators knew at the time they proposed departmental seniority that Lorillard was hiring blacks only for certain departments at the Greensboro plant.

17. On January 1, 1960, defendants entered into a new collective bargaining agreement containing substantially the same seniority provisions as the 1957 agreement, and maintaining the allocation of jobs on the basis of departmental and job seniority and sex.

18. On January 1, 1962, defendants entered into a new collective bargaining agreement continuing the allocation of jobs on the basis of departmental seniority and sex. However, the 1962 agreement made the following changes in seniority provisions:

(a) A posting and bidding procedure was established, to be used in the filling of job vacancies.

(b) The prohibition of transfers between departments was eliminated.

(c) Job seniority was abolished.

The elimination of job seniority by the 1962 agreement permitted employees within a department to advance to job openings without following any line of progression. Employees could bid for vacancies on the basis of their departmental seniority, without regard to whether they had performed jobs previously required as stepping stones to the vacant jobs. Employees could then skip three or four classifications in moving into vacancies. Since 1962, employees have not been required to follow a line of job progression within any department.

Although the 1962 agreement eliminated the prohibition of transfers between departments, employees who transferred were *required to forfeit their accumulated seniority in the department they transferred from.* In addition, they *began as new employees* in the department they transferred to.

19. On March 1, 1965, defendants entered into a new collective bargaining agreement continuing the allocation of jobs on the basis of departmental seniority. However, a provision was added permitting employees who had transferred to a department and who, because they lacked sufficient seniority to resist a

cutback, were subject to being laid off, to return to their same or a comparable job in the department they transferred from without loss of seniority in either department. Employees who transferred were placed in the lowest-paying jobs in the department of transfer, regardless of their length of service with Lorillard or at the Greensboro plant.

Under the 1965 agreement, job allocation on the basis of sex was eliminated. This permitted employees to work on jobs that had formerly been reserved for persons of a certain sex.

20. On March 1, 1968, defendants entered into a new collective bargaining agreement, effective until March 1, 1971, *continuing the provisions of the 1965 agreement* among which provisions the allocation of jobs on the basis of departmental seniority was continued in effect.

In the negotiations leading to the 1968 agreement, Lorillard *proposed* to modify seniority to achieve the following purpose:

"[To] permit employees from one department to transfer to some other department of their choice to fill vacancies which may occur and allow their seniority to be recognized in the new department for job bidding purposes, cutbacks and other instances where seniority should rule."

Lorillard's proposal in the 1968 negotiations provided that after a residency period of thirty days in a department, employees would be entitled to exercise their full seniority for all purposes, computing such seniority from the date of their employment with the company and not simply from their length of service within a given department.

Employees under Lorillard's 1968 proposal would be awarded job vacancies if they had the greatest seniority "provided the employee has the ability to perform the job." Also, a senior employee laid off from his or her department would be entitled to displace the most junior employee in a job paying $2.465 per hour or less in *any* other department. Recall of laid off employees would be on a plant-wide basis, in the reverse order in which they were laid off. They would be recalled and required to accept, upon penalty of dismissal, whatever position was offered to them in whatever department there were openings.

The contract embodying Lorillard's 1968 proposal was rejected by a vote of the majority of the membership of Local 317. The Local 317 president stated that the seniority proposal "didn't go far enough for the Negro people, and it went too far for the white people." After Local 317 had rejected its contract proposal, Lorillard increased its offer of wages and fringe benefits and withdrew its seniority proposal; the contract proposal was then accepted by a majority of the membership of Local 317.

21. The essentials of the departmental seniority system have been continued in effect from 1957 to date—departmental seniority still governs promotions to better jobs, the filling of temporary vacancies, the right to be recalled from layoff, and the right to resist cutbacks and layoffs. Vacation benefits, however, are determined by length of service with the company rather than departmental seniority.

Under the departmental seniority system in effect from 1957 to date, the most senior employee bidding for a job is put on the job and trained for it; if after training it appears that the employee is not able to perform the job, he is taken off the job. In other words, the employee's ability to perform the job is determined after he has been put on the vacant job.

22. The departmental seniority system, in conjunction with Lorillard's initial discriminatory hiring policy, has the following continuing racially discriminatory effects:

(a) Negro employees hired into the blending, cutting, service and shipping and receiving departments because of their race are making substantially less money than white employees hired into

"white" departments during the same period.

(b) The white employees hired into white departments during the period when blacks were excluded, and who are still in their departments of hire, have more departmental seniority than any of the Negroes who have transferred to a white department. Therefore, even though many of the Negroes have been longer employed by Lorillard, they are more vulnerable to being cut back to lower paying jobs or being laid off than the white employees.

(c) Transfers between departments have been and are discouraged. For example, a conditioner operator in the blending department (formerly black department) now earning $3.23 per hour would have to take a 20% pay cut if he transferred to the filter making department (formerly white department), where the entry level job now pays $2.58 per hour. Approximately 85% of the Negroes and 97% of the whites in the 1956–62 group have stayed in their original departments.

23. In the departments from which they were previously excluded, blacks as a group hold substantially lower-paying and more menial jobs than whites. For example:

(a) Blacks do not occupy any of the five highest job classifications in the filter department.

(b) Blacks do not occupy any of the eight highest job classifications in the packing department.

(c) Blacks do not occupy any of the fourteen highest job classifications in the export department.

(d) Blacks do not occupy any of the three highest job classifications in the maintenance department.

24. The International Union has taken no affirmative steps to advocate plant-wide seniority or eliminate discriminatory departmental seniority.

25. All transfers between July 2, 1965, and December 31, 1968, were successful, in that all employees who transferred from unrelated departments were able successfully to learn jobs in their new departments. No aptitude test was required for entry into any department.

DISCUSSION

The present effect of this seniority system might be illustrated as follows: if two race cars are placed evenly, one beside the other, and started at the same instant, one being allowed to accelerate to 50 m.p.h. in 7 seconds and the other in 10 seconds, with both vehicles to remain at 50 m.p.h. indefinitely, there will be an evident distance gap between the two. Even though the constant speed limit of 50 m.p.h. affects each car equally, it also serves to preserve and perpetuate the gap created when one, at an earlier time, was denied an advantage allowed the other. Persuasive and controlling authority correctly has termed such practice unlawful when applied to an individual's employment status because of race, color, religion, sex, or national origin. Griggs v. Duke Power Co., 4 Cir., 420 F.2d 1225 (1970); United States by Clark v. Local 189, etc., 282 F. Supp. 39 (E.D.La.1968); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968).

42 U.S.C. § 2000e–2 provides in pertinent part:

"(a) It shall be an unlawful employment practice for an *employer*—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment,* because of such individual's *race,* color, religion, sex or national origin; or

"(2) *to limit, segregate, or classify* his employees in any way which would deprive or tend to deprive any individual of *employment opportunities or otherwise adversely affect his status* as an employee, because

of such individual's *race,* color, religion, sex, or national origin.

\* \* \* \* \* \*

"(c) It shall be an unlawful employment practice for a labor organization—

"(1) to exclude or to expel from its membership, *or otherwise to discriminate* against, any individual, because of his *race,* color, religion, sex, or national origin;

"(2) *to limit, segregate or classify* its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of *employment opportunity, or would limit such employment opportunities, or otherwise adversely affect his status,* as an employee or as an applicant for employment, because of such individual's *race,* religion, sex or national origin; or

"(3) to cause an employer to discriminate against an individual in violation of this section.

\* \* \* \* \* \*

"(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a *bona fide* seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, *provided that such differences are not the result of an intention to discriminate because of race,* color, religion, sex or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin \* \* \* " (Emphasis added)

Prerequisites to a given seniority or merit system meeting standards of the Act, as set forth in § 2000e–2(h), are proper answers to the questions:

(1) Is this system *bona fide?*

(2) Is it the result of an *intention* to discriminate?

To be a "bona fide" system within the meaning of the Act, the system must serve a valid *business purpose.* Two lines of thought appear to have been advanced with respect to the meaning of *business purpose* or *business necessity* and what value courts should ascribe to those words in determining whether a given employment practice is unlawful or not.

As applied to these facts, the argument most in keeping with the primary policy of Title VII of the Civil Rights Act of 1969 reasons as follows: If a seniority or merit system perpetuates the effects of prior discrimination, irrespective of whatever business purposes are served, it cannot be allowed to stand. In other words, a valid business purpose can offer no absolution to an employer or a labor organization who is acting in a discriminatory fashion. Where effects of discrimination are present, the system cannot be regarded as *bona fide.* Griggs v. Duke Power, *supra.*

The second argument reasons that "business necessity" is an element to be balanced against the anti-value of discrimination or its continuing effects. If the *business necessity* is somehow vital to the operation of a particular industry, and if, *in the Court's opinion, it outweighs whatever vestiges of discrimination are thereby maintained,* it may be considered *bona fide.*

The departmental seniority system here in question does serve a valid business purpose in that a shorter period of training could reasonably be anticipated for persons familiar with operations of their own department. Even so, it must be held an unlawful employment practice. This system as maintained by the present (as well as former) collective bargaining agreement carries for-

**842**

ward, in perpetuation, consequences of racial discrimination from the past.

Even if rules in accord with the second argument mentioned above were to be adopted and applied, it is further found that the business purposes served by the seniority system in this case are not so important as to override the ill effects thereby perpetuated. By neither standard is this system bona fide.

If, however, for the purposes of argument only, the system were *bona fide* in all respects, it would still be violative of the Act—failing to meet the second part of the statutory requirement. The parties defendant, acting with intimate knowledge of the full effect which departmental seniority had upon past hiring practices, cannot be said to have not intended the result.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under the provisions of § 706(f) of the Civil Rights Act of 1964, 42 U.S. C. § 2000e–5(f).

2. Lorillard Corporation is an employer in an industry affecting commerce, within the meaning of § 701(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

3. The International Union is a labor organization engaged in an industry affecting commerce, within the meaning of § 701(d), (e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d), (e).

4. Local 317 is a labor organization engaged in an industry affecting commerce within the meaning of § 701(d), (e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d), (e).

5. Plaintiffs have complied with the procedural requirements of §§ 706(a), (d) and (e) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–5(a), (d) and (e).

■ 6. This action is properly maintained as a class action under Rule 23(b) (2) of the Federal Rules of Civil Procedure. The affected class is composed of all Negroes presently employed by Loril-

lard who were hired into the blending, cutting, service and shipping and receiving departments between the opening of the plant and May 31, 1962.

■ 7. The departmental seniority system maintained by defendants at the Greensboro plant constitutes a continuing discrimination against members of the affected class and an unlawful employment practice in violation of §§ 703 (a) and (c) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2 (a) and (c).

■ 8. The practice or policy of defendants of denying members of the affected class full seniority rights upon transfer to the regular making, filter making, export, packing and maintenance departments and in governing promotions, cutbacks, layoffs and recall rights by length of service within such departments is a term, condition and privilege of employment. that discriminates against members of the affected class on the basis of their race in violation of §§ 703(a) and (c) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and (c).

■ 9. The practice or policy of defendants of deterring members of the affected class from transferring to the formerly all-white departments by requiring them to suffer a reduction in wages and loss of seniority as a condition of transfer constitutes a term, condition and privilege of employment that discriminates against members of the affected class on the basis of their race, in violation of §§ 703(a) and (c) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and (c).

■ 10. The departmental seniority system maintained by defendants limits, segregates and classifies members of the affected class so as to deprive them or tend to deprive them of employment opportunities and adversely affect their status as employees, because of their race, in violation of §§ 703(a) and (c) of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) and (c).

11. Defendants have intentionally engaged in and are intentionally engaging in the unlawful employment practices described in Conclusions 7 through 10 above, within the meaning of § 706(g) of the Civil Rights Act of 1964, 42 U.S. C. § 2000e–5(g).

■ 12. None of the unlawful employment practices in Conclusions 7 through 10 above results from a bona fide seniority or merit system within the meaning of § 703(h) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), but rather each such practice is the result of a seniority system that discriminates against Negro employees hired into the blending, cutting, service and shipping and receiving departments because of their race.

13. This Court is authorized by § 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g) to enjoin the discriminatory practices described herein and to order other appropriate affirmative relief in the nature of backpay.

An Order will be entered in accordance with these Findings.

Consistent with these Findings, counsel for the plaintiffs will prepare and present to the Court an appropriate order, which order shall provide among its provisions for the implementation in the Greensboro plant of the defendant Lorillard: (1) the proposal by Lorillard during the 1968 collective bargaining negotiations with reference to seniority, and (2) the procedure commonly known as "red circling," which procedure allows an employee transferring into a new department to continue at the wage he earned in the department from which. he transferred until such time as he reaches an equivalent rate in the new department.

Further, the order will provide that within fifteen days after the date of the order counsel for the plaintiffs will submit to the Court suggested methods by which backpay may be computed for each member of the affected class with special attention to instructions that should be given a special master should

the Court decide to appoint a special master. The defendants shall have ten days thereafter in which to file counter-suggestions.

While more meritorious defenses have in some cases been presented, the defenses here cannot be fairly characterized as extreme. Therefore, the Court declines to award counsel fees as part of the costs for the plaintiffs.