Robert HICKS, individually and on behalf of all others similarly situated

v.

CROWN ZELLERBACH CORPORA-TION, the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, Magic City Local No. 362, of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, Bogalusa Local 624 of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers.

Civ. A. No. 16638.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Nov. 6, 1970.

Richard B. Sobol, Washington, D. C., George Cooper, New York City, Lolis Elie, Nils R. Douglas, Collins, Douglas & Elie, New Orleans, La., for plaintiffs and intervenors.

Michael J. Molony, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Crown Zellerbach Corporation.

C. Paul Barker, Dodd, Hirsch, Barker & Meunier, New Orleans, La., James E. Youngdahl, McMath, Leatherman, Woods & Youngdahl, Little Rock, Ark., for defendant Unions.

Daniel Steiner, Washington, D. C., Acting General Counsel for United States Equal Employment Opportunity Commission, amicus curiae.

HEEBE, District Judge:

This action was filed by plaintiff, Robert Hicks, on June 16, 1966. In the ensuing period, the Court has had occasion to issue several memorandum opinions on procedural issues,[1] as well as three injunctive orders.[2] This opinion,

1. See 49 F.R.D. 184, 187 (1967) (ruling on *class action and intervention*) ; 49 F.R.D. 184, 195 (1967) (motion to amend and scope of class on testing issue) ; 49 F.R.D. 184, 193 (1967) (discovery).

2. See 49 F.R.D. 184, 198 (1968) (seniority); 49 F.R.D. 184, 200 (1968) (progression lines) ; 310 F.Supp. 536 (1970) (union merger).

and the subsequent order, are now issued to decide the remaining questions on the merits.[3]

Plaintiff, a Negro, initiated this action on his own behalf and in behalf of a class or subclasses of persons similarly situated. The action concerns the employment practices of the defendants, Crown Zellerbach Corporation (hereinafter "Crown"), the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO (hereinafter "the International") and Magic City Local No. 362 of the International (hereinafter "Local 362") with respect to the converting plants operated by Crown in Bogalusa, Louisiana.[4] By order dated June 13, 1967, this Court permitted the intervention of A. Z. Young and Elmer Rogers, both of whom are Negro employees of Crown's Box Plant in Bogalusa, Louisiana.

In their complaint, as amended, plaintiffs and plaintiff-intervenors raised the following six issues:

1. Whether, in the circumstances of this case, Crown violated Title VII by conditioning employment, as well as the promotion of incumbents to certain jobs, on the successful completion of a battery of objective tests;

2. Whether Crown violated Title VII by conditioning the right of black employees to transfer to jobs from which blacks had previously been excluded on the successful completion of a battery of tests, where those tests had not been administered to white incumbents in those jobs;

3. Whether the defendants violated Title VII by maintaining dual lines of progression in three departments in the Box Plant, where such lines had previously been established to segregate black from white employees;

4. Whether the defendants violated Title VII by requiring black employees to suffer a reduction in pay, as a condition of entry into lines of progression formerly reserved to whites;

5. Whether in the circumstances of this case, the defendants violated Title VII by relying on a job seniority standard for the promotion of black employees in lines of progression from which they had formerly been excluded;

 6. Whether the segregated local unions maintained by the International should be ordered merged, and if so, the appropriate terms on which such a merger should be effected.[5]

---

3. On June 16, 1967, the principal defendant, the Crown Zellerbach Corporation, signed an agreement with the Office of Federal Contract Compliance of the United States Department of Labor, which altered some of the employment practices that are the subject of this action.

The relevance of this agreement to specific issues in the case is discussed in notes 7, 12 and 17, *infra.*

4. The converting plants are a Box Plant, a Grocery Bag Plant, and a Multiwall Bag Plant. The production and maintenance employees at the three plants comprise a single unit, for which the International is the certified collective bargaining representative. Pursuant to the terms of this Court's order of February 25, 1970, Local 362 is now the local union of the International comprising all these employees. Previously, the International had maintained separate locals segregated

by race, Local 362 for white employees and Local 624 for black employees.

5. In addition to the question on the merits, there are several procedural issues as to which the Court has previously ruled, but has not set forth its reasons.

On March 16, 1966, pursuant to the terms of § 706(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(a), the plaintiffs filed with the Equal Employment Opportunity Commission a timely charge of discrimination, adequately raising each of the issues set forth in text. On May 27, 1966, an attorney for the plaintiffs wrote to the EEOC requesting statutory notification of the results of the Commission's efforts to secure voluntary compliance, within the sixty-day period established under § 706(e). On June 9, 1966, the Commission's Director of Compliance responded to the May 27, 1966, letter, stating that conciliation activities had

In advance of, and at the trial on the merits, the Court received three lengthy stipulations of fact. Testimony was heard over a period of eight full days. In addition, several depositions and stipulations of testimony were received in evidence. In prior orders, the Court finally disposed of the fifth and sixth issues listed above. See 49 F.R.D. 184 (E.D.La.1968), as amended (Oct. 30, 1969) (seniority issue); 310 F.Supp. 536 (union merger issue). Those issues are not reconsidered in this opinion, and nothing in this opinion and the subsequent order is intended to affect the terms or effect of those orders. In this opinion, the Court considers each of the remaining four issues in the order listed above. In connection with each, the relevant facts will be stated, as well as the

Court's conclusion as to the appropriate size of the subclass represented by the plaintiffs as to the issue.[6]

### I.

*Whether, in the circumstances of this case, Crown violated Title VII by conditioning employment, as well as the promotion of incumbents to certain jobs, on the successful completion of a battery of objective tests.*

■ Beginning in 1963, all applicants for production or maintenance employment at Crown's facilities in Bogalusa were required to attain certain minimum scores on several standardized tests. In April 1964, at least in the Box Plant, defendants extended this test requirement to employees seeking transfer to more desirable departments or jobs.

been undertaken, but that the Commission had not been successful in securing voluntary compliance within the sixty-day period. The complaint in this Court was filed on June 16, 1966.

On these facts, in support of its motion to dismiss, Crown has argued, first, that the suit was untimely inasmuch as it was filed more than ninety days after the filing of the EEOC charge, and, second, that the suit is unauthorized because plaintiff had not received as a necessary precondition to suit statutory notification under § 706(e). Both arguments are without merit.

The basis of the first argument is that federal suit under Title VII must be filed within thirty days of the expiration of the sixty-day period for the EEOC's processing of a charge set forth in § 706(e). This argument was directly rejected by the Court of Appeals in Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969). The only time requirement for the filing of suit in federal court is the thirty-day period following receipt of notification from the EEOC required by § 706(e).

The second argument accepts this conclusion but argues that in this case no such notification was given. Apparently, because of its informal tone, Crown argues that the June 9, 1966, letter is inadequate to this purpose. That letter plainly states that the EEOC had not achieved voluntary compliance within sixty days and thus conveyed the information called for by § 706(e). When read in light of the May 27, 1966, letter requesting §

706(e) notification, the June 9 letter plainly satisfies the terms of that section. Suit was filed well within thirty days of the June 9 letter.

Crown has also argued that plaintiffs' rights are somehow adversely affected by plaintiffs' filing of an earlier and a later EEOC charge. Plaintiff has made clear that his sole jurisdictional reliance for this suit is the March 16, 1966, charge. This charge was timely, as the questions complained of therein were "continuing." With regard to this charge, the statutory prerequisites to suit were satisfied. The existence of other charges not forming a basis for this action is of no relevance.

6. On June 13, 1967, this Court denied Crown's motion for a determination that the action could not be maintained as a class action. 49 F.R.D. 184. Thereafter, in Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968), an unrelated case, the Court of Appeals confirmed this Court's position that class actions are maintainable under Title VII. The court there indicated that a plaintiff in a Title VII case may represent several subclasses with respect to each of several issues, and that the dimensions of each subclass are determined by the persons affected by the challenged practice. In this case, the Court has found that the subclass represented by plaintiff Hicks varies from issue to issue and has indicated the dimensions of the particular subclass in connection with its discussion of each issue.

These departments or jobs had previously been officially segregated for whites; the adoption of the test requirement accompanied the lifting of official segregation. The details of this test requirement varied from time to time. When this complaint was initiated, it consisted of the Wonderlic Personnel Test (minimum score—18), the Bennett Test of Mechanical Comprehension, Form AA (minimum score—31) and the SRA Non-Verbal Test (minimum score dependent on score on Wonderlic Personnel Test). The same requirement was applied to both present employees seeking transfer to certain departments or jobs and to new applicants. Plaintiff Hicks took, and failed, this test battery in an unsuccessful effort to secure transfer to the formerly white-only progression line in the Corrugator Department. Due to the uniformity of the testing procedure for applicants for jobs in any of the facilities, we have previously defined the subclass for this testing issue to include all Negro employees in the Box Plant who have not previously passed the test, and all Negro applicants for employment at any Crown Zellerbach facility in Bogalusa.[7]

Plaintiffs have challenged these tests on the ground that they disqualify a disproportionate number of Negroes and that they do not predict job performance. Plaintiffs' concern about these tests was well-founded. The evidence indicated that 37.3% of the whites as compared to 9.8% of the Negroes were passing the Wonderlic. On the Bennett, the passing rate was 64.9% of the

whites and only 15.4% of the Negroes. The SRA Non-Verbal also significantly favored whites. There was no claim that defendants had adopted the tests for the express purpose of capitalizing on these differential passing rates, nor was evidence adduced to support such a claim. Rather, it was the effect of the tests in opening jobs to a high percentage of whites while excluding all but a small percentage of Negroes which plaintiffs challenged.

In this respect, the case is quite similar to Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, cert. den. 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), and numerous other decisions striking down use of seniority and referral systems which were adopted innocently of racial motivation, but which operated to prefer whites over Negroes. *See*, United States v. Hayes International Corporation, 415 F.2d 1038 (5th Cir. 1969); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123 (8th Cir. 1969); Dobbins v. Local 212 IBEW, 292 F.Supp. 413 (N.D.Ohio 1968); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968); United States v. Bethlehem Steel Corp., 312 F.Supp. 977 (W.D.N.Y.1970). These seniority systems were declared unlawful because the preference for whites was not shown to be justified by business necessity. The decisions establish that where an employer adheres to a practice which significantly prefers whites over Negroes, that practice must fall before Title VII unless the employer can show business necessity for it. This

---

7. Order, June 23, 1967, 49 F.R.D. 184, 187.

Subsequent to the commencement of these proceedings, the defendants agreed with the OFCC for the discontinuance of their testing program and, on that ground, they have asked that the testing issue be declared moot. However, there is no real assurance that the program, or some similar program, will not be resumed in the future. Crown has vigorously persisted in its claim that its testing program is lawful and that the company has an absolute right to institute such a program. Under these circumstances, it would be an

abdication of responsibility for the Court to refuse to decide the issue.

"It is a well settled principle of law that cessation of illegal conduct at the prompting of legal proceedings is not sufficient to render a case moot." Tyson v. Cazes, 363 F.2d 742 (5th Cir. 1966).

See United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 308, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); Walling v. Helmerich and Payne, Inc., 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29 (1944); Anderson v. City of Albany, 321 F.2d 649 (5th Cir. 1963).

principle has also been applied in cases declaring nepotism requirements unlawful, Local 53, International Association of Heat & Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969), and barring use of arrest records as a hiring criterion, Gregory v. Litton Systems, Inc., 316 F.Supp. 401 (C.D.Cal.1970).

█ No reason appears why Crown Zellerbach's use of tests should not also be governed by the rule that business necessity must be shown to justify a practice which substantially prefers whites over Negroes. This conclusion has been reached by the United States Equal Employment Opportunity Commission in its recently published "Guidelines on Employee Selection Procedures," 35 Fed.Reg. 1233 (Aug. 1, 1970). The EEOC guidelines require that tests be "validated" in accordance with professional standards in order to comply with Title VII. In lay terms, this simply means that the skills measured by the tests must be shown to be relevant to the employer's job performance needs. While EEOC rulings are not binding on this Court, they are entitled to great deference, particularly on a matter, such as use of employment tests, which involves great professional expertise. See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); International Chemical Workers v. Planters Mfg. Co., 259 F.Supp. 365, 366–367 (N. D.Miss.1966). Moreover, the EEOC guidelines are consistent with the consensus of expert opinion presented to this Court.[8] This testimony established that tests can be immensely valuable to an employer if properly employed, but they are just as frequently of no value in selecting employees. The choice of appropriate tests for an employer is a difficult procedure requiring careful study and evaluation. Without such study, even experienced professional psychologists concede that they can do no more than make guesses which are often completely wrong. Moreover, the uncertainty surrounding test use is aggravated when tests are given to a mixed racial group which has been educated in segregated schools because tests assume that persons have had relatively equal exposure to educational materials. This makes careful professional study even more essential in such a situation. Without such study, no employer can have any confidence in the reasonableness or validity of his tests; and he therefore cannot in good faith assert that business necessity demands that these tests of unknown value be used. Title VII does not permit an employer to engage in unsubstantiated speculation at the expense of Negro workers.

█ Since it is clear that Crown Zellerbach has engaged in no significant study to support its testing program, the program is unlawful. The defendant's testing program was adopted on recommendation of its personnel department without professional study. All expert witnesses agreed that the tests had no relevance to lower and middle level jobs in the plant. Defendants did introduce testimony that the tests might have relevance to some upper level jobs but this was not supported by proper study as called for by the EEOC, and it was hedged with uncertainty as to the probable extent of relevance, which was conceded to be relatively slight. Moreover, there was no evidence as to the likelihood of any employee even reaching the upper level jobs for which the tests might be relevant. Other experts took the position that the tests were probably not relevant even for upper level jobs,[9]

---

8. The Court heard two days of expert testimony on this issue by highly qualified professional psychologists called by both plaintiffs and defendants and received extensive deposition testimony from other experts.

9. These witnesses based their conclusion in part on an unpublished study conducted by the United States Employment Service in a number of paper companies all over the country (not including the Crown Zellerbach Company). This

which goes to confirm that test use under the circumstances in this case is a matter which can only be speculated upon even among experts.

This decision to declare the defendant's testing program unlawful is in accord with the recent decision in Arrington v. Massachusetts Bay Transportation Authority, 306 F.Supp. 1355 (D.Mass. 1969). We concur with the conclusion stated in *Arrington* that:

"If there is no *demonstrated* correlation between scores on an aptitude test and ability to perform well on a particular job, the use of the test in determining who or when one gets hired makes little business sense." 306 F.Supp. at 1358 (emphasis added)

See, United States v. Sheetmetal Workers, Local 36, 416 F.2d 123, 136 (1969); Penn v. Stumpf, 308 F.Supp. 1238 (N. D.Cal.1970).

A contrary view was taken by the Court of Appeals for the Fourth Circuit in Griggs v. Duke Power Co., 420 F.2d 1225 (1970), cert. granted, 399 U.S. 926, 90 S.Ct. 2238, 26 L.Ed.2d 791 (1970). A divided court in *Griggs* held that tests could be used by an employer even if not job related so long as the tests were not adopted for purposes of racial discrimination. This decision adopts a narrow view of Title VII which has been rejected in this circuit. The Court of Appeals for the Fifth Circuit made it clear in Local 189, United Papermakers and Paperworkers v. United States, *supra*, that a practice need not be adopted with the purpose or intent of discriminating to be invalidated under Title VII. The seniority system struck down in that case was originally adopted without any racially discriminatory motives; and the court ruled that the only form of "intent" required under Title VII is that "the defendant meant to do what he did, that is, his employment practice was not acci-

dental." 416 F.2d at 995–997. Other courts have taken the same position:

"An intent to discriminate is not required to be shown so long as the discrimination shown is not accidental or inadvertent. The intentional use of a policy which in fact discriminates between applicants of different races and can reasonably be seen so to discriminate [use of arrest records as ground for not hiring], is interdicted by the statute, unless the employer can show a business necessity for it." Gregory v. Litton Systems, Inc., *supra*, at 403.

"Intent" in this sense obviously exists here just as fully as it did in the *Local 189* and *Gregory* cases. See, United States v. Bethlehem Steel Co., 312 F. Supp. 977 (W.D.N.Y.1970); Blumrosen, "Seniority and Equal Employment Opportunity: A Glimmer of Hope," 23 Rutgers L.Rev. 268, 280–84 (1970).

Nor do defendant's testing practices draw any support from § 703(h) of Title VII, which authorizes use of "professionally developed" tests which are not "designed, intended or used to discriminate." Whatever else, defendant's tests are "used to discriminate" because they greatly prefer whites to Negroes without business necessity. In his incisive dissenting opinion in Griggs v. Duke Power Co., *supra*, Judge Sobeloff carefully and extensively analyzed the legislative history of § 703(h) and demonstrated that Congress had no intent to sustain tests which are not justified as job related. This Court concurs in that analysis. Defendant's argument in seeking to protect its discriminatory testing program under the cloak of the "test" clause in § 703(h) is almost identical to its prior attempt, in this case and the *Local 189* case, to protect its discriminatory seniority system under a companion clause of § 703(h). The Court of Appeals rejected that defense in the *Local 189* case, and it must be rejected here as

study, which was introduced into evidence, apparently showed tests similar to the Wonderlic Personnel Test and the Bennett Test of Mechanical Comprehen-

sion to have no relevance to one of the most sophisticated jobs in the Box Plant, the job of Corrugator Machine Operator.

well. To interpret § 703(h) as protecting use of tests which are not shown to be job related would be to drastically undercut the overall legislative purpose of Title VII, which is to eliminate all unjustified impediments to the realization of full equal employment opportunity for Negroes. No court should read this result into a minor subsection of Title VII absent the strongest and most explicit legislative intent; and such does not appear in support of § 703(h).

Since the testing program in this case clearly violates Title VII, its use for any members of the class will be permanently enjoined. Moreover, no substitute testing program will be permitted unless it is first demonstrated to the Court that such program has veen validated in accordance with the principles set out in the EEOC "Guidelines on Employee Selection Procedures," *supra*.

## II.

*Whether Crown violated Title VII by conditioning the right of black employees to transfer to jobs from which blacks had previously been excluded on the successful completion of a battery of tests, where those tests had not been administered to white incumbents in those jobs.*

■ The foregoing ruling on testing will dispose of the issue as to the entire class. However, as to one subgroup within the class there is an additional ground on which the testing program is unlawful. This subgroup consists of those Negroes employed at the Box Plant prior to the date in 1963 when tests were required as a prerequisite to hiring. Were it not for defendant's former practices of official racial segregation, these Negroes would have been eligible for jobs in more desirable departments immediately upon hiring. Many of them would now be serving in these departments and would, therefore, have no need to request transfer and submit to a testing program. White employees hired contemporaneously with Negroes in this subgroup are already in this favored position—they are employed in desirable departments where they may have high pay without any need to submit to a testing program.

This discrimination between contemporaneously hired whites and Negroes is the baldest form of discrimination. Defendants forced Negro workers into less desirable jobs. When this official segregation was lifted, the company imposed a new testing requirement on present employees wishing to transfer—a requirement having its primary, if not total, impact on formerly segregated Negroes wishing to improve their job status.

This device of escalating admission standards when opportunities are opened to Negroes has often been attempted in the voting rights context and it has been struck down. See, *e. g.*, United States v. Dogan, 314 F.2d 767 (5th Cir. 1963); *cf.* Lane v. Wilson, 307 U.S. 268, 59 S. Ct. 872, 83 L.Ed. 1281 (1939); Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915). It is equally unlawful under Title VII. In reaching this conclusion, we are supported by the full court in Griggs v. Duke Power Co., *supra*, which ruled similarly on virtually identical facts. There is, to our knowledge, no contrary decision.

■ The point is simply this. An employer is free to raise his employment standards after the enactment of Title VII to the extent job performance needs demand such. But he must raise the standards across the board, not in a fashion which exempts large groups of whites while restricting most blacks. To the extent any whites who have not been subjected to the test requirement are permitted to remain on their jobs, contemporaneously hired Negroes cannot be excluded from those jobs by virtue of the test requirement.

## III.

*Whether the defendants are in violation of Title VII by virtue of their maintenance of separate lines of progression in three departments.*

■ Prior to the abolition of formal racial restrictions on job assignments, certain jobs in the Corrugator, Paster, and Over the Road Trucking Departments in the Box Plant were reserved to whites, and other, less desirable jobs, were reserved to Negroes. With the exception of the Over the Road Trucking Department, where there are only two jobs, one reserved for whites and the other for Negroes,[10] the jobs for each race within a department were structured into separate lines of progression, with no connection between the two.[11] When the formal racial restrictions on job assignments were abandoned in 1964, these separate lines were retained. The only change was that black workers, including the black workers in the formerly black-only progression line in the department, were permitted to bid with all other employees, on the basis of their total length of service at the plant, for openings in the entry job of the formerly white-only line of progression, or, in the case of the Over the Road Trucking Department, for the formerly white-only job.[12]

Plaintiff Hicks and plaintiff-intervenor Rogers, who were assigned to formerly black-only jobs in the Corrugator and Over the Road Trucking Departments, respectively, contend that the enactment of Title VII requires not only that formal racial restrictions on job assignments be abolished, but that the dual lines of progression that had been established in these three departments on a racial basis be dissolved and that single nonracial lines of progression be

10. For convenience, this opinion occasionally refers to the maintenance of separate progression lines in all three departments, even though the Over the Road Trucking Department has only two jobs, one formerly white-only and one formerly black-only, and no progression lines, because the distinction is without relevance to the analysis set forth in the opinion.

11. In the Corrugator Department, there are six jobs in the formerly white-only line of progression and three in the black-only line of progression. Prior to August 1, 1965, the entry job in the white progression line in the Corrugator Department was filled by the senior employee in the Score group, a section of the Cutting Department that was reserved to white employees. On August 1, 1965, the formerly white-only jobs in the Corrugator Department became an independent line of progression, with vacancies in the entry job filled by plant-wide bidding.

In the Paster Department, there were originally four white jobs and two black jobs, each structured into separate lines of progression. On January 11, 1966, the job of Rod Man was transferred from the bottom position in the formerly white-only line of progression to the senior position in the formerly black-only line of progression. The purpose of this change was apparently to lessen the discriminatory impact of the continued maintenance of separate progression lines.

12. The June 16, 1967, agreement between Crown and the OFCC altered the promo-

tional system in these three departments. Specifically, in the Paster Department, employees assigned to the Rod Man job, then the senior job in the formerly black-only line (see note 11) were permitted to add their job seniority to their employment seniority in bidding on the entry job in the former white-only line, while all other employees bid on the basis of their employment seniority only. A similar provision applied to the employees in the highest ranking formerly all-black job in the Corrugator Department, but these rights were also provided to employees bidding out of the formerly white-only Score Operator's job in the Cutting Department (see note 11). In the Over the Road Trucking Department, a line of progression leading from the formerly black-only to the formerly white-only jobs was established, but a clerk's job, a non-production job traditionally restricted to whites, was also included in the progressional line leading to the truck driver's job. An opening in the driver's job was filled by the employee in *either* the service job (formerly black-only) or the clerk's job.

These provisions ameliorated, but did not eliminate, the discriminatory effect of the failure to treat the formerly black jobs as the exclusive route to the white jobs, and for this reason do not alter the question to be decided by the Court. Compare United States v. Local 189, United Papermakers and Paperworkers, 301 F. Supp. 906, 913 (E.D.La.1969).

established for all jobs within each of these departments. On December 19, 1968, upon a showing that the entry job in the formerly white-only line of progression in the Corrugator Department was about to be filled by a white employee from outside the department, this Court issued a preliminary injunction prohibiting the defendants, pending a final resolution of this issue, from awarding that position to any employee other than the senior employee in the formerly black-only progression line in that department. 49 F.R.D. 184, 200 (E.D.La. 1968).

Upon consideration of the facts relating to this issue, the Court concurs in plaintiffs' position that, under the circumstances presented here, Title VII requires that the separate progression lines in the three departments be treated as single lines, at least until all black employees assigned to black-only lines before the elimination of official segregation have had the opportunity to progress into the entry job in the formerly white-only progression line. This conclusion is based on the following considerations:

*First,* the defendants have sought to justify the maintenance of the separate lines on the ground that the lines reflect differences in the degree of skill required for the jobs involved, *i. e.,* that the jobs in the formerly white-only lines are more highly skilled than the formerly black-only jobs in the same departments. But apart from the three departments in which jobs were separated for racial reasons, Crown has not divided jobs within departments into separate lines of progression based on skill requirements. It is undisputed that in the several departments in the Box Plant in which only whites were permitted to work prior to 1964,[13] all the jobs, from the most menial to the most highly skilled, were included in single lines of progression.[14]

*Second,* the plaintiffs introduced evidence of the prevailing practice regarding the organization of jobs in similar departments at other box plants. Thirty-seven collective bargaining agreements to which the International is a party were introduced, including six to which Crown is a party, under which jobs are organized into lines of progression. In each, all the jobs in the Corrugator and Paster Departments are included in single lines of progression. In no case is there any division between skilled and unskilled jobs.

*Third,* there is uncontroverted expert evidence of record that the maintenance of separate progression lines in these departments is inconsistent with efficient operations. Employees in the jobs previously reserved for Negroes have ample opportunity to learn at least some aspects of the jobs previously reserved for whites, and are thus more quickly able to learn to assume the functions of the latter jobs than are employees who have not previously worked in the department.[15] The only production employees of Crown to testify at the trial confirmed the functional and learning relationship of the formerly black and formerly white jobs in the Corrugator Department. This has not been seriously contradicted by the defendants.

For these reasons, the Court concludes that the maintenance of separate lines of progression in the three departments in the Box Plant is traceable not to considerations of efficiency, but solely to the prior policy of segregating jobs according to race. In addition, the continuation of these separate lines after the elimination of the formal job segregation operates to the serious disadvantage

---

13. These departments include the Cutting Department, the Finishing Department, the Post and Beer End Gluer Departments and the Maintenance Department.

14. This conclusion is strongly supported by the testimony of Crown's expert witness, Dr. Allyn Munger, who discussed the various skill levels of jobs in formerly white-only departments.

15. See Deposition of Mr. Leslie Roberts.

of the black employees assigned to the formerly black-only jobs in these three departments. Whereas these employees are ineligible to bid directly for the skilled jobs in the formerly white-only departments because of the single lines of progression in these departments, which force an employee to enter the department in an unskilled job, white employees in other departments are free to compete with these black employees for the skilled jobs in the Corrugator, Paster and Over the Road Trucking Departments. In other words, white employees in the unskilled jobs in all the other departments have protected and exclusive rights to advance to the skilled jobs in their own departments, but black employees in the unskilled jobs in the Corrugator, Paster and Over the Road Trucking Departments are required to compete with all other employees in the plant for the better jobs in their departments. And they are required to suffer this disadvantage only because of the defendants' prior maintenance of segregated job classifications, with the attendant segregated progression lines, and because of the defendants' failure to merge the lines with the elimination of formal segregation.

Section 703(a) of the Act provides that it is an unlawful employment practice for an employer "to limit, segregate, or classify his employees in any way which would tend to deprive any individual of employment opportunities * * * because of [his] race * * *." This provision does not dictate the maintenance of any particular promotional system. Single lines of progression can be maintained within departments. Separate lines of progression for skilled and unskilled jobs can be established. There can be no lines of progression. What is required, however, is that any promotional system must be applied evenhandedly so as not to disadvantage any employee on grounds of race. The system maintained by the defendants, which gives unskilled white employees greater promotional opportunities than unskilled black employees, for reasons directly traceable to prior segregation and not founded in any objective business considerations violates this provision.

The subclass represented by plaintiff Hicks on this issue is composed of the black employees in the Corrugator, Paster and Over the Road Trucking Departments who were assigned to those departments prior to the elimination of racial discrimination in job assignments on April 7, 1964. In order to interfere as little as possible with the terms of the outstanding collective bargaining agreement, consistent with the elimination of the discrimination, the Court will not require that the formerly black and white jobs in these three departments be merged into single lines of progression, but merely that the members of the subclass in each department be offered vacancies in the formerly white-only job or the formerly white-only entry job in order of their seniority and in preference to any other employee in the plant, until this pool of employees is exhausted.[16] The order will leave the defendants free to either merge the jobs into permanent progression lines or not, at their choice, since once the members of the subclass are offered preferred rights of entry, the issue of single or dual lines is without racial implications.

### IV.

*Whether the defendants violated Title VII by requiring black employees to suffer a reduction in pay, as a condition of entry into lines of progression formerly reserved to whites.*

Several of the formerly black-only jobs in the Box Plant have hourly rates of pay higher than the rates for the entry jobs in some of the formerly white-only lines of progression. Nonetheless, the formerly white lines of progression lead to better paying jobs than those available in the formerly Negro lines. Under the terms of the Collective

---

16. This provision is, of course, subject to the particular employee's ability to learn the position in question.

Bargaining Agreement, an employee transferring from one department to another is required to accept the rate assigned to the job to which he transfers, regardless of the rate of the job from which he transfers. As a result, Negro employees who were originally assigned to segregated jobs are now required to suffer a reduction in pay in order to enter formerly white-only progression lines.

The identical issue was before this Court in the context of Crown's Paper Mill in Bogalusa, in United States v. Local 189, United Papermakers and Paperworkers, 301 F.Supp. 906, 915, 918, 923 (E.D.La.1969). There, this Court held:

> "The policy of the defendants in deterring Negro employees from transferring to formerly all-white lines of progression by requiring these employees to suffer reduction in wages and the loss of all promotional security as a condition of transfer constitutes a 'term, condition and privilege of employment' that discriminates against Negro employees on the basis of race, in violation of Sec. 703(a) of the Civil Rights Act of 1964, 42 U. S.C. Sec. 2000e–2(a)."

301 F.Supp. 918. *Accord,* Clark v. American Marine Corp., 304 F.Supp. 603, 607–608 (E.D.La.1969); Robinson v. Lorillard Corp., 319 F.Supp. 835 (M.D. N.C.1970).

For the same reason, the Court here will require that Crown permit employees who were assigned to formerly black-only jobs prior to the elimination of job segregation to transfer to the entry job in formerly white-only lines of progression without suffering a reduction in their current wage level.[17]

## V.

### Attorneys Fees

Plaintiffs are entitled to reasonable attorneys fees in accordance with 42 U.S.C. Sec. 2000e–5(k). See Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L. E.2d 1263 (1968); United States v. Local 189, United Papermakers and Paperworkers, 301 F.Supp. 906 (E.D.La. 1969); Clark v. American Marine Corp., 320 F.Supp. 709 (E.D.La.1970). The parties are instructed to attempt to agree on a reasonable fee and its appropriate allocation among the defendants under the standards set forth by Judge Rubin in Clark v. American Marine Corp., *supra.* If the parties have not reached such an agreement within thirty days, the Court will allow the fee and allocate it, upon a consideration of a statement of service, filed and served upon counsel for the defendants, who shall have ten days to serve and file a response.

Plaintiffs will prepare a decree in accordance with this opinion and submit it to opposing counsel for approval within twenty days. It should be submitted to the Court, with the approval of the defendants or a statement of the grounds of their opposition, within ten days thereafter. Upon submission of the decree, an injunction will be granted in favor of the plaintiffs.

17. Under the terms of the June 16, 1967, agreement with the OFCC, Crown established a procedure for the rate protection of black employees transferring to former-ly white-only jobs. For the reasons stated in footnote 7, this agreement does not moot the issue before the Court.